IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number: 16-cv-60993-WPD

HOWARD BOWE Sr., and BELINDA RAMOS,
as the Co-personal representatives of the estate of
HOWARD BOWE Jr., deceased,
HOWARD BOWE III, a child of HOWARD BOWE, Jr.,
NB a minor child of HOWARD BOWE, Jr.,
and HB a minor child of HOWARD BOWE, Jr.,

      Plaintiffs,

v.

The CITY OF HALLANDALE BEACH [DWAYNE
FLOURNOY in his capacity as the Chief of Police of
the City of Hallandale Beach]; MICHAEL MCKENZIE,
PAUL HEISER, CHRISTOPHER ALLEN, and MARC
DUBUISSON, in their individual capacities as officers
with the City of Hallandale Beach Police Department,

      Defendants.

_____/

**FOURTH AMENDED COMPLAINT**

STUART N. KAPLAN, ESQUIRE
Florida Bar No. 0647934
JOSEPH G. SCONZO, ESQUIRE
Florida Bar No. 0508720
GREGORY S. SCONZO, ESQUIRE
Florida Bar No. 0105553
skaplan@ksplaw.com; gsconzo@ksplaw.com
Email: jwise@ksplaw.com
KAPLAN SCONZO & PARKER, P.A.
PGA Financial Plaza
3399 PGA Boulevard, Suite 150
Palm Beach Gardens, Florida 33410
Telephone: (561) 296-7900

David A. Frankel, Esq.
Florida Bar Number: 741779
Law Offices of David A. Frankel PA
david@bluelotuslaw.com
service@bluelotuslaw.com
20 South East 20th Street
Fort Lauderdale, Florida 33315
(954) 683-0300

*Attorneys for Plaintiffs*

Plaintiffs, HOWARD BOWE, Sr., BELINDA RAMOS, and HOWARD BOWE III, sue Defendants, CITY OF HALLANDALE BEACH [DWAYNE FLOURNOY in his capacity as the Chief of Police of the City of Hallandale Beach], MICHAEL MCKENZIE, PAUL HEISER, CHRISTOPHER ALLEN, and MARC DUBUISSON, jointly and severally, and say:

## NATURE OF THE ACTION

1.      This is an action for damages arising from violations of federal civil rights laws and the laws of the State of Florida, resulting from the shooting death of HOWARD BOWE, Jr., and the unlawful assault and detention of his minor son HOWARD BOWE III, during the execution of a search warrant by the City of Hallandale Beach Police Department's Special Weapons and Tactics ("SWAT") Team, and the failure of the CITY OF HALLANDALE BEACH, and its Chief of Police DWAYNE FLOURNOY to establish and/or implement policies sufficient to prevent such abuses, especially against persons of color, such that the failure of policy was the moving force and a direct cause of the violations.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. § § 1981, 1983, 1985, 1988, the Fourth, and Fourteenth Amendments to the United States Constitution, the tort laws of Florida, and the Florida Wrongful Death Act. Jurisdiction is founded on 28 U.S.C. § § 1331, 1343, 42 U.S.C. § 1988, the constitutional provisions mentioned above, the tort laws of Florida, and the Florida Wrongful Death Act. Supplemental jurisdiction, and joinder of parties for additional state law claims is proper pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy.

3.      In connection with the acts, practices and violations alleged below, the Defendants have each directly violated clearly established constitutional rights, as well as statutory and

2

common law duties owed to each Plaintiff.

4.      Under 28 U.S.C. § 1391(b)(2), venue lies in the District Court for the Southern District of Florida, Fort Lauderdale division, because it is the judicial district and division in which a substantial part of the events or omissions giving rise to the claims occurred.

5.      All conditions precedent to the maintenance of this action, including those notice requirements set forth in Florida Statute § 768.28, have been performed, have occurred prior to its institution, or have been waived.

## PARTIES

6.      Plaintiff HOWARD BOWE, Sr., was at all times material hereto, a resident of Broward County, Florida, and is the father and legal representative of the Estate of HOWARD BOWE, Jr. ("HOWARD Jr."), upon whose death this case is based. The decedent, HOWARD Jr., was a thirty-four-year-old African American in good health and, until his death, a productive member of our society. Decedent HOWARD Jr. is survived by his three children who were all minors at the time HOWARD Jr. was killed.

7.      Plaintiff BELINDA RAMOS, was at all times material hereto, a resident of Broward County, Florida, and is the mother and co-legal representative of the Estate of HOWARD Jr., upon whose death this case is based.

8.      Plaintiff HOWARD BOWE III ("HOWARD III"), was at all times material hereto, a resident of Broward County, Florida, and is the son of the decedent, HOWARD Jr., upon whose death this case is based. Plaintiff HOWARD III was a minor at the time of the events complained of herein and has since been without a father figure.

9.      Defendant CITY OF HALLANDALE BEACH ("CITY") is a municipal entity incorporated in the State of Florida whose boundaries are located wholly within Broward County.

The Hallandale Beach Police Department ("HBPD") is a subdivision of the CITY, created and designated to provide law enforcement services subject the all Federal and State statutes and constitutional provisions.

10.   DWAYNE FLOURNOY ("FLOURNOY") is the Chief of Police of the HBPD. FLOURNOY is responsible for the officers in his employ, and ensuring that the officers, employees, servants and agents of the HBPD obey the laws of the State of Florida and the United States. FLOURNOY is also the final policymaker responsible for all operational and investigative policies, training and supervision, practices, customs, and orders of the HBPD.

11.   At all times material hereto, the actions, policies, procedures, customs and/or practices of the HBPD and FLOURNOY were one and the same as those of Defendant CITY.

12.   FLOURNOY'S actions and omissions as set forth herein are also synonymous with the HBPD and Defendant CITY.

13.   Defendant MICHAEL MCKENZIE ("MCKENZIE") is a duly appointed law enforcement officer of the HBPD, at all times material hereto acting under color of law, to wit: under the color of statutes, ordinances, regulations, policies, practices, customs and usages of Defendant CITY, FLOURNOY, and/or the State of Florida. Defendant MCKENZIE is being sued in his individual capacity. Defendant MCKENZIE killed decedent HOWARD Jr. without legal cause or excuse, violating his rights under the Fourth and Fourteenth Amendments to the United States Constitution. It is further alleged that these violations were committed as a result of the policies, practices, and customs established and maintained by Defendant CITY and FLOURNOY, and their deliberate indifference thereof.

14.   Defendant PAUL HEISER ("HEISER") is a duly appointed law enforcement officer of the HBPD, at all times material hereto acting under color of law, to wit: under the color

of statutes, ordinances, regulations, policies, practices, customs and usages of Defendant CITY, FLOURNOY, and/or the State of Florida. Defendant HEISER is being sued in his individual capacity.

15.     Defendant CHRISTOPHER ALLEN ("ALLEN") is a duly appointed law enforcement officer of the HBPD, at all times material hereto acting under color of law, to wit: under the color of statutes, ordinances, regulations, policies, practices, customs and usages of Defendant CITY, FLOURNOY, and/or the State of Florida. Defendant ALLEN is being sued in his individual capacity.

16.     Defendant MARC DUBUISSON ("DUBUISSON") is a duly appointed law enforcement officer of the HBPD, at all times material hereto acting under color of law, to wit: under the color of statutes, ordinances, regulations, policies, practices, customs and usages of the Defendant CITY, FLOURNOY, and/or the State of Florida. Defendant DUBUISSON is being sued in his individual capacity.

## GENERAL ALLEGATIONS

**A.     CITY DIVIDED: THE POLITICS OF RACIAL INEQUALITY**

17.     From the time Hallandale (later Hallandale Beach) was incorporated as a town in 1927, until the present day, there has existed a pattern of racial hostility against its African American residents.

18.     Today, Hallandale Beach continues to be a racially divided city with vestiges of open hostility toward the black residents living in the city's northwest area. This hostility includes documented instances of discriminatory statements and conduct by city officials, HBPD policy makers and officers of the HBPD.

19.     The institutionalized nature of the racism in Hallandale Beach in modern times has

been widely known and the subject of numerous news stories predating the incident at issue in this Complaint.[1]

20.     Residents of Hallandale Beach have long voiced these complaints and concerns to Hallandale Beach Officials at Town Hall meetings and other gatherings of leaders in the community.

**B.     NOTICE OF UNCONSTITUTIONAL ACTS WITHIN THE CITY**

21.     The CITY's actions in this case and previous similar situations indicate a policy and custom of indifference to the rights of those they arrest who are unarmed and non-threatening and a failure to properly train and/or supervise their officers in how to deal with unarmed and non-threatening persons being arrested.  The CITY's and FLOURNOY's refusal to adequately train its officers on how to interact with unarmed and non-threatening persons—and the CITY's and FLOURNOY's failure to supervise those officers—has resulted in the infliction of deadly and/or excessive violence upon unarmed and non-threatening persons and the violation of their constitutional rights.  This lack of training and supervision causes these ill-trained and ill-equipped officers to resort to the use of deadly or excessive force as their only alternative.

22.     The CITY's officers have increasingly and alarmingly used deadly and excessive force in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force.  There has specifically been an increasing and alarming number of similar

---

[1] Previous headlines covering race relations in the City include: "Mayor Rejects Racism Charge" (2000); "Tensions Run High Between City Officials and Hallandale Beach's Predominantly Black Northwest Neighborhood" (2004); "Finally, a New Pool for Hallandale Beach's Black Community" (2013); "Hallandale City Attorney Alleges Racial Discrimination After Commissioner Threatens Her Job" (2015); and "Hallandale Fire Chief Put on Leave Amid Discrimination Claims" (2015).

incidents where the CITY's officers have utilized deadly or excessive force resulting in death or serious injuries against these individuals or endangered the public by the intentional and/or negligent misconduct by the CITY's officers.   A review of the complaints surrounding and investigations of these incidents shows a conscious disregard to the facts and circumstances surrounding each incident and a blanket justification of the actions of the deputies involved.

23.     Further, there has been a pattern of similar incidents in which citizens were unjustifiably killed, seriously injured, or otherwise endangered by the intentional and/or negligent misconduct of the CITY's officers, revealing serious incompetence or misbehavior that is general or widespread throughout the department.

### i.   Military-Swat Raids in the Northwest Quadrant

24.      Hallandale Beach is home to what has been termed an ongoing "drug-war"; the HBPD have been carrying out pre-dawn and nighttime raids in predominantly black neighborhoods since at least 1999.

25.     Community Leaders and media outlets have long voiced that these raids have disproportionately occurred in the northwest quadrant of the CITY, particularly within the same square mile area where decedent HOWARD Jr. lived.

26.     Anthony Sanders, the CITY's only black City Commissioner, when discussing these raids has expressed "The best we can hope for is that policies change…I'm not saying there doesn't ever need to be a raid..But [the CITY's] reasons for raids are too minimal."

27.     A review of the known HBPD Swat raids since 1999 makes evident that these raids not only targeted Hallandale's black neighborhoods but also were conducted in an unconstitutional manner.

28.     On February 9, 1999, the HBPD SWAT team conducted a late-night raid on the

home of Catherine and Edwin Bernhardt based on a drug investigation targeting a black male. They had the wrong address.  Police busted open the Bernhardt's window and jammed an assault rifle inside. Edwin Bernhardt woke up and ran downstairs in the nude. The Police pinned Edwin to the wall with a rifle against his neck, handcuffed him, then grabbed him by the throat and threw him into a chair. Police pushed Catherine to the floor and handcuffed her at gunpoint. A police officer outfitted Edwin with a pair of his wife's underwear. Despite glaring discrepancies between the facts contained within the affidavit and search warrant and actual facts surrounding the raid, neither the officers on scene nor their supervisor realized that HBPD Swat had raided the wrong house and the wrong individuals. Rather, Edwin was arrested and spent several hours in jail, still clad only in the underwear, until police realized their mistake and drove him home. The City's attorney, Richard Kane, denied any police responsibility, stating that citizens should expect such tactics as the price on the war on drugs, "They made a mistake. (referring to the officers) There's no one to blame for a mistake . . . the way these people were treated has to be judged in the context of a war." The Bernhardts brought a federal lawsuit against the CITY and the involved officers in the United States District Court for the Southern District of Florida, CASE No.: 0:99-cv-06456-SH. The Bernhardts alleged counts of violation of their constitutional rights pursuant to 42 U.S.C. § 1983 against all parties. Specifically, as to the CITY, it was alleged that the CITY had a custom, policy, practice, and pattern of permitting and tolerating actions of its police officers of failing to knock or announce their presence before serving search warrants, using excessive force against members of the public, and failing to review incidents of abuses of lawful authority. A Notice of Voluntary Dismissal was entered in this matter noting that the parties had settled. It was reported that the terms of the settlement required the City of Hallandale Beach to pay $100,000.00.

29.     A year later, on January 27, 2000 the HBPD SWAT made another botched raid,

storming the home of a nine (9) month pregnant woman and her three young children. Again relying upon an Affidavit and Search Warrant which contained materially false statements, a warrant was issued authorizing a SWAT raid of Ms. Tracey Bell's home. The affidavit based on a tip from an informant who said he'd bought drugs at Ms. Bell's home, however this was known to be false. Notwithstanding that HBPD SWAT had a knock and announce warrant, HBPD SWAT failed to "knock and announce" or state any words informing the residents that they were HBPD or serving a warrant. Rather, HBPD SWAT burst open the door without justification striking an eleven (11) year old minor child with debris. HBPD SWAT threw a pregnant Ms. Bell on the floor and then forcibly handcuffed her while bending her over a sofa. Notwithstanding the obvious inconsistencies within the affidavit and search warrant, the officer proceeded to search Ms. Bell's home for drugs but did not find any drugs. Despite clear evidence that HBPD had confused Ms. Bell's home with the one next door, HBPD insisted that this time, unlike with the Bernhardt raid, they had the correct address. No officers were disciplined for the mistake. Ms. Bell brought a federal lawsuit on behalf of herself and her children against the CITY and the involved officers in the United States District Court for the Southern District of Florida, CASE No.: 0:02-cv-60786-JEM. Ms. Bell alleged counts of violation of their constitutional rights pursuant to 42 U.S.C. § 1983 against all parties, as well as trespass, and invasion of privacy. Specifically, as to the CITY, it was alleged that the CITY had a custom, policy, practice, and pattern of permitting and tolerating actions of its police officers of failing to knock or announce their presence before serving search warrants, erroneously executing search warrants at the wrong residence, and using excessive force against members of the public. This matter was ultimately settled with a Motion to Approve Settlement involving Minor Children indicating that the total monetary amount paid by the CITY was $99,000.00.

9

30.     In 2004, the Hallandale Beach Police Department conducted an eight-month investigation called *"Operation Westside"* that focused on drug dealers in the city's *northwest section.* A train track along Dixie Highway separates the rest of Hallandale Beach's predominantly white from the predominantly black *Westside.*

31.     Since 2006, the HBPD has conducted at least 38 known SWAT raids for the purpose of executing warrants to search for narcotics. Although Defendant CITY and FLOURNOY are adamant that they do not engage in the selective enforcement of laws against persons of color living in the CITY and/or against residents living in certain areas of the CITY, statistical data suggests otherwise. Ninety-two percent (92%) of the 38 known SWAT raids disproportionately occurred in the northwest quadrant of the CITY, and within the same square mile area where decedent HOWARD Jr. lived. A map plotting the locations of the 38 SWAT raids is attached hereto as Exhibit A. A description of all the known raids is as follows:

(1)     On January 6, 2006, the HBPD SWAT Unit conducted a raid at 121 No. Dixie Highway Apt. 1 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. The use of the SWAT Unit was intended to assist the HBPD Vice and Narcotics Unit ("VIN") in the execution of a search warrant. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one piece of crack cocaine and three small baggies containing cocaine in powder form. No evidence was found to indicate the processing of powder cocaine into crack form, or to indicate sales of cocaine in large quantities. At the time of the raid HBPD arrested twenty-two-year old black male Gerard Crossley who was inside the home. Mr. Crossley had no prior criminal history. On June 20, 2006, as a result of his arrest, Mr. Crossley became a convicted felon. 121 No. Dixie Highway Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately half a mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to, and after January 6, 2006 HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(2)     On January 27, 2006, the HBPD SWAT Unit conducted a raid at a duplex apartment at 404 Northeast 2nd Street East Apartment Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one piece of crack cocaine and two small baggies containing marijuana. A 9mm handgun was also located under a bed. At the time of the raid HBPD arrested twenty-three-year old black male Erik Smith. 404 Northeast 2nd Street East Apartment Hallandale Beach, Florida is in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately a mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to, and after January 27, 2006 HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(3)     On January 27, 2006, the HBPD SWAT Unit conducted a raid at 406 Northwest 7th Court Apt. #4 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized several pieces of crack cocaine, two baggies containing powder cocaine, and one baggie containing marijuana. At the time of the raid HBPD arrested thirty-four-year old black male Felix Grace who was inside the home. Mr. Grace had no prior criminal history**.** On January 31, 2008, as a result of his arrest, Mr. Grace became a convicted felon. 406 Northwest 7th Court Apt. #4 Hallandale Beach, Florida is in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than a half-mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to, and after January 27, 2006 HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(4)     On February 8, 2006, the HBPD SWAT Unit conducted a raid at 511 Foster Rd. Northwest, corner room, Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. 511 Foster Rd. Northwest Hallandale Beach, Florida is in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately a quarter-mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to, and after February 8, 2006 HBPD conducted

no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(5)    On February 9, 2006, the HBPD SWAT Unit conducted a raid at 113 Northeast 2nd Avenue Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized three pieces of crack cocaine. 113 Northeast 2nd Avenue Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to February 9, 2006 HBPD, until the present conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(6)    On July 6, 2006, the HBPD SWAT Unit conducted a raid at 620 Northeast 2nd Court Apt. #6 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one bag of marijuana and an empty bag with suspect marijuana residue. Mr. Kennington Giscombe, who was at the home at the time of the raid was arrested. On October 17, 2006, as a result of his arrest, Mr. Giscombe became a convicted felon. 620 Northeast 2nd Court Apt. #6 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to February 8, 2006, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(7)    On September 25, 2006, the HBPD SWAT Unit conducted a raid at 411 North Dixie Hwy. Apt. #6 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one baggie containing suspect cocaine residue. 411 North Dixie Hwy. Apt. #6 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and

poor. It is approximately half a mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to September 25, 2006, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(8)     On September 26, 2006, the HBPD SWAT Unit conducted a raid at 821 Northwest 7th Avenue Apt. #4 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one piece of crack cocaine. At the time of the raid HBPD arrested twenty-three-year old black male Travis Greene who was inside the home. On July 16, 2007 was convicted of a felony. 821 Northwest 7th Avenue Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than a quarter-mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to September 26, 2006, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(9)     On February 5, 2007, the HBPD SWAT Unit conducted a raid at 1010 No. Federal Highway Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. 1010 No. Federal Highway Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to February 5, 2007, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(10)    On February 5, 2007, the HBPD SWAT Unit conducted a raid at 411 North Dixie Hwy. Apt. 6, Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one piece of crack cocaine, and six baggies containing marijuana. 411 North Dixie Hwy. Apt. 6, Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are

primarily black and poor. It is less than one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to February 2, 2007, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(11)    On April 11, 2008, the HBPD SWAT Unit conducted a raid at 909 Southeast 2nd Avenue End Unit, Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized six baggies containing residue of suspect cocaine and marijuana. 909 Southeast 2nd Ave. Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one and a half miles from the from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to April 11, 2008, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(12)    On August 21, 2008, the HBPD SWAT Unit conducted a raid at 313 Northwest 7th Street, Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized three pieces of suspect crack cocaine, and "multiple bags of weed."  313 Northwest 7th Street, Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to August 21, 2008, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(13)    On August 21, 2008, the HBPD SWAT Unit conducted a raid at 833 Northwest 10th Street, Apt. #4 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized two "small" baggies of marijuana. 833 Northwest 10th Street, Apt. #4 Hallandale Beach, Florida is located

in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to August 21, 2008, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(14)    On October 24, 2008, the HBPD SWAT Unit conducted a raid at 539 N.W. 1st Avenue Apt. #8 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one "small plastic baggie containing crack cocaine residue." 539 N.W. 1st Avenue Apt. #8 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is a half-mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to October 24, 2008, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(15)    On July 3, 2009, the HBPD SWAT Unit conducted a raid at 608 N.W. 5th Avenue Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized several baggies containing suspect residue cocaine and four partially smoked marijuana cigarettes. 608 N.W. 5th Avenue Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to July 3, 2009, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(16)    On July 27, 2009, the HBPD SWAT Unit conducted a raid at 753 Northwest 4th Street Apt. B Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized seven pieces of crack cocaine, and two baggies containing suspect cocaine residue. 753 Northwest 4th Street Apt. B

Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is 528 feet from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to July 27, 2009, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(17)    On May 12, 2010, the HBPD SWAT Unit conducted a raid at 806 Northwest 7th Terr. Apt. #19 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized a glass containing suspect cocaine residue. At the time of the search police arrested 29-year old Kenard Allen and charged him with possession of cocaine. On July 12, 2010 the Broward County State Attorney decline to file the charge. 806 Northwest 7th Terr. Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one-quarter mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to May 12, 2010, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(18)    On June 10, 2010, the HBPD SWAT Unit conducted a raid at 620 Northwest 4th Avenue South Apt. Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized two pieces of crack cocaine, cocaine residue, and 6 marijuana roaches. 620 Northwest 4th Avenue South Apt. Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to June 10, 2010, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(19)    On November 5, 2010, the HBPD SWAT Unit conducted a raid at 703 Northeast 7th Street Apt. #105 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.

At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized five pieces of crack cocaine. 703 Northeast 7th Street Apt. #105 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to November 5, 2010, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(20)     On November 16, 2010, the HBPD SWAT Unit conducted a raid at 703 Northeast 7th Street Apt. #105 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized loose cannabis from the floor and a box. 703 Northeast 7th Street Apt. #105 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to November 16, 2010, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(21)     On April 1, 2011, the HBPD SWAT Unit conducted a raid at 704 Foster Road Apt. #2 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized one piece of crack cocaine and an amount of marijuana. 704 Foster Road Apt. #2 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is 1050 feet from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to April 1, 2011, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(22)     On August 1, 2011, the HBPD SWAT Unit conducted a raid at 703 Northeast 7th Street Apt. #108 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the

residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized "Numerous pieces of crack cocaine." 703 Northeast 7th Street Apt. #108 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to August 1, 2011, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(23)   On March 8, 2012, the HBPD SWAT Unit conducted a raid at 804 Northwest 6th Avenue North Apartment Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized "loose cannabis."  804 Northwest 6th Avenue Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to March 8, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(24)   On March 8, 2012, the HBPD SWAT Unit conducted a raid at 804 Northwest 6th Avenue South Apartment Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized a bag of cannabis, and a cannabis cigarette.  804 Northwest 6th Avenue Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to March 8, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily

(25)   On March 29, 2012, the HBPD SWAT Unit conducted a raid at 324-E Northeast 3rd Street Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized a one piece of crack cocaine, suspect

powder cocaine and suspect cocaine residue.   324-E Northeast 3rd Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to March 29, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(26)   On May 16, 2012, the HBPD SWAT Unit conducted a raid at 508 Northwest 9th Street Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.  At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized "suspect powder cocaine." HBPD VIN Unit arrested Mr. Darryl Florence. On July 12, 2013, all charges against Mr. Florence were nolle pross'ed by the State of Florida.   508 Northwest 9th Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to May 16, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(27)   On June 27, 2012, the HBPD SWAT Unit conducted a raid at 214 Northwest 3rd St. Apt. #1 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the search HBPD seized a small amount "suspect cannabis." 214 Northwest 3rd St. Apt. #1 Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to June 27, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(28)   On or about June 29, 2012, the HBPD SWAT Unit conducted a raid at 1005 Foster Road Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.   At the time of the raid the HBPD had no information to indicate that any occupant of the residence

presented a threat of danger to officer safety or that weapons were located inside. 1005 Foster Road Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to June 29, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(29)    On or about October 19, 2012, the HBPD SWAT Unit conducted a raid at 26 Southwest 10th Street Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the raid police seized a small amount of cannabis and crack cocaine. 26 Southwest 10th Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to August 28, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(30)    On October 24, 2012, the HBPD SWAT Unit conducted a raid at 1013 Northwest 1st Avenue Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.   At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. 1013 Northwest 1st Avenue Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to November 21, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(31)    On or about November 21, 2012, the HBPD SWAT Unit conducted a raid at 800 Moffett Street Apt. # 3 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. 800 Moffett Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is

approximately one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to November 21, 2012, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(32)     On or about March 21, 2013, the HBPD SWAT Unit conducted a raid at 800 Moffett Street Apt. # 3 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. 800 Moffett Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to March 21, 2013, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(33)     On or about September 20, 2013, the HBPD SWAT Unit conducted a raid at 900 Northeast 2nd Street Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the raid police seized a bag of marijuana and a bag of unspecified "narcotics." 900 Northeast 2nd Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to September 20, 2013, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(34)     On or about December 13, 2013, the HBPD SWAT Unit conducted a raid at 509 Northwest 6th Street to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.   At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the raid police seized a small baggie containing cocaine, a small baggie containing a piece of crack and a small baggie containing marijuana. 509 Northwest 6th Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is less than one-quarter mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to

December 13, 2013, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(35)     On or about January 8, 2014, the HBPD SWAT Unit conducted a raid at 517 Northwest 1st Avenue Apt. #3 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.   At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the raid police seized a small baggie marijuana. At the time of the raid HBPD arrested Mr. Manase Babuta who had no prior felony arrests. On February 19, 2014, as a result of the arrest Mr. Babuta became a convicted felon. 517 Northwest 1st Avenue Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is one-half mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to January 8, 2014, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(36)     On February 13, 2014, the HBPD SWAT Unit conducted a raid at 608 Moffett Street Apt. 3 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.   At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. 608 Moffett Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to January 8, 2014, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(37)     On March 4, 2014, the HBPD SWAT Unit conducted a raid at 210 Southeast 8th Street Apt. #4 Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs. The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales.   At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. As a result of the raid police seized a small amount of cocaine and marijuana. 210 Southeast 8th Street Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately one mile from the home where Howard Bowe, Jr. was shot and

killed. During the 10 years prior to March 4, 2014, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

(38)   On January 20, 2006, the HBPD SWAT Unit conducted a raid at a duplex apartment located at 902 SW 5th Street, Hallandale Beach, Florida to assist the HBPD VIN Unit to search for illegal drugs.  The basis of the probable cause for the search was an investigation using a confidential informant to engage in street level narcotics sales. At the time of the raid the HBPD had no information to indicate that any occupant of the residence presented a threat of danger to officer safety or that weapons were located inside. 902 SW 5th Street, Hallandale Beach, Florida is located in an area of Hallandale Beach consisting of residents who are primarily black and poor. It is approximately one mile from the home where Howard Bowe, Jr. was shot and killed. During the 10 years prior to January 8, 2014, and to the present, HBPD conducted no such similar drug investigations and/or SWAT Unit raids in any other area of Hallandale Beach which was populated by residents who were primarily white, or would otherwise be considered a "white" neighborhood.

32.   Except for two individuals who were of Hispanic origin, each person arrested and charged with crimes in relation to the discriminatory pattern of police narcotics investigations and accompanying SWAT Unit raids outlined above were black.

33.   None of the 38 known SWAT raids referenced above resulted in the recovery of any substantial amount of drugs. In the majority of cases, the HBPD found insignificant amounts of cocaine or marijuana—one raid yielded nothing but a single marijuana joint, while at least four other raids yielded no drugs at all.

34.   These SWAT raids were the result of a policy, practice or custom of selective enforcement of laws against the persons of color living in the CITY, and/or against residents living in certain areas of the CITY.

35.   The drug investigations leading to these search warrants, and the ensuing raids, were each directly approved and authorized by FLOURNOY acting as Chief of Police and final policy-maker for the HBPD.

36.   Moreover, FLOURNOY, a former SWAT team member himself, personally issued

the orders and directives to conduct these SWAT raids. As such, these orders and directives constituted official policies, procedures, customs and/or practices of the CITY and the HBPD.

37.     On multiple occasions since FLOURNOY became Chief of Police, members of the CITY's commission, acting in their official capacity, during official CITY proceedings, stated that they defer to FLOURNOY in matters related to the operation of the HBPD, as the commissioners choose not to interfere with how FLOURNOY runs the HBPD. Therefore, it is indisputable that at all times relevant hereto FLOURNOY was the final-policy maker for the policies, practices, customs and/or procedures of the HBPD.

38.     Even in the wake of HOWARD Jr.'s death, Defendant CITY maintains that the SWAT raids were a useful tool. Defendant CITY, through Pete Dobens, the official City spokesman, stated that "[HOWARD Jr.'s death] is a consequence" of drug dealing, and that "to the community, the value [of SWAT raids] is immeasurable." This racially tone-deaf statement was made in the face of an avalanche of complaints made by members of the community against aggressive police tactics, and a lack of concern for the consequences by the HBPD and CITY'S government.

39.     The CITY'S official policy targeting the northwest quadrant alone with SWAT raids to eradicate drugs is *prima facia* proof of racial prejudice and discriminatory CITY policy, practice and/or custom. Moreover, the statement of Mr. Dobens suggesting that the value to the residents of Hallandale Beach from these SWAT raids is "immeasurable" evinces a Jim Crow mentality that ignores the obvious immeasurable harm of unleashing military-grade weapons and tactics to recover insignificant amounts of drugs.

40.     According to the *SWAT Standards for Law Enforcement* published by the National Tactical Officers Association in 2008, the purpose and intent of SWAT level operations is to

respond to emergency and high-risk incidents, as well terrorist attacks. The SWAT raids conducted by HBPD in the northwest section of the CITY did not meet these criteria.

41.     The SWAT raids themselves, the CITY'S official position espousing their "immeasurable value," as well as statements made by FLOURNOY, or other members of the HBPD, to the residents of the affected neighborhood and other community representatives who complained, strongly suggests that the SWAT raids were intended to be exemplary warnings and deterrents, and as token law-and-order gestures for the rest of the neighborhood.

42.     During this same period of time, Defendant CITY conducted no such SWAT raids in areas of the CITY that were predominantly white or more affluent.

43.     Based on information and belief, during this same period, FLOURNOY and the CITY conducted no similar pattern of drug enforcement in areas of the CITY which were predominantly white or more affluent. Defendant CITY and FLOURNOY chose instead to single out the neighborhood where decedent HOWARD, Jr. lived.

44.     Defendant CITY and FLOURNOY authorized and condoned a degree of militarization, including, equipment and weaponry, appearance, commands and/or operational patterns, which were excessive, unnecessary and unwarranted, based on information known to HBPD officers prior to the operations.

45.     Defendant CITY and FLOURNOY determined policies and practices that considered every execution of a search warrant based on suspicion of drug activity to be "high risk" no matter what information was known prior to the operation, or what might occur during. The SWAT raids conducted in or near decedent HOWARD Jr.'s home were for the service of "low-risk" search warrants; none of the search warrants rose to the level of "high-risk" as determined by the standards of the National Tactical Officers Association guidelines, recognized

SWAT procedure experts, and clearly established law, because in those instances the HBPD had no particular knowledge that the residents of the home identified in the warrants were known to be violent or possess weapons; that there were any weapons kept inside the home; that the homes were equipped with surveillance or security equipment that might compromise officer safety; or that it would be unsafe to comply with the statutory duty to knock and announce to identify the presence of law enforcement.

46.     Therefore, FLOURNOY knew, or should have known, that the use of the SWAT Team for the purpose of the execution of these warrants was unnecessary and a misapplication of a militarized approach that should be reserved for only the most extreme circumstances.

47.     In each instance, the policies established by FLOURNOY for the implementation of SWAT raids, as well as the training or supervision of the HBPD officers conducting them, and the ensuing failure to calculate and consider the actual threat to safety involved, was contrary to nationally accepted standards and protocols established by responsible and authoritative experts and police oversight organizations, as well as clearly established law.

48.     This "one size fits all" practice resulted in the execution of the search warrant here such that it was not properly planned, and was executed in a manner that was overly aggressive and violent, whereby the officers involved made nonsensical decisions that themselves were the cause of the dangerous conditions, and tragic results.

49.     As a former member of the HBPD SWAT team, FLOURNOY knew, or should have known, of the training and supervision required to avoid unnecessary uses of force, poor decisions by team members that compromise safety, and/or inadequate planning and execution of such raids.

50.     SWAT operations entail the use of special equipment, apparel, technology,

weaponry, stun grenades and/or tactics of surprise that carry inherent dangers in and of themselves. This can create an extreme level of danger for officers who engage in such SWAT raids who have not received specialized and appropriate training and supervision. FLOURNOY had a duty to ensure that its members were properly trained and supervised to ensure that they carried out these aggressive and violent operations to limit the chance of death or injury in every instance.

### ii. Known Instances of Unconstitutional Excessive Force by HBPD Officers

51.     FLOURNOY has been employed as a police officer with the HBPD since 1987, and its Chief of Police since 2011. While a pattern and practice of unlawful use of force and arrests predated FLOURNOY becoming Chief, particularly since becoming Chief, and prior to May 8, 2014, both he and Defendant CITY were made aware of a pattern of unlawful use of force, unlawful seizures and/or arrests, and racial profiling leading to unequal enforcement of laws by members of the HBPD.

52.     Since the time FLOURNOY became Chief of Police, several highly-publicized police involved shootings indicate a culture and environment where HBPD officers feel comfortable in the knowledge that they can violate the rights of Hallandale Beach Residents, most particularly African Americans, without fear of scrutiny, discipline or criminal charge. In each instance HBPD conducted an internal affairs investigation that exonerated the actions of the officers involved, or resulted in the failure of the HBPD to make any finding, so as to prevent an adverse consequence to the officer(s) involved. As set forth below numerous citizens complained to the CITY'S commission or to FLOURNOY directly regarding the deficiency of the investigations. Some of the incidents and investigations involved include:

a.  On December 4, 2011, Hallandale Officer Jamie Cerna stopped Kareem McDonald, an African-American who was suspected of taking an 18-pack of beer from someone.

At the time of the stop, Mr. McDonald was riding a bicycle and Officer Cerna pulled his police car in front of Mr. McDonald to effectuate the stop. Officer Cerna exited his police car and ordered Mr. McDonald to raise his hands and Mr. McDonald complied. At this point in time Mr. McDonald was still straddling his bike and was at least 20 feet away from Officer Cerna. Officer Cerna then shot Mr. McDonald one time striking him in the arm. Mr. McDonald was unarmed when he was shot. Mr. McDonald was transported to the hospital. The investigation into Officer Cerna's conduct is has not yet been completed by the HBPD. The failure to complete the investigation in a timely matter is itself a direct result of FLOURNOY'S insufficient policies and practices as set forth in detail below. Officer Cerna was one of the SWAT team members who participated in the raid of HOWARD Jr's. home.

      b.   On January 8, 2012, HBPD Officer Edward McGovern shot at an unarmed robbery suspect three times resulting in his death. At all times relevant the suspect, Gregory Ehlers, was posed no eminent threat of death or bodily harm to himself, others, or the officers on scene. Mr. Ehlers was running from the police after he had stolen some electronics from a Best Buy. Hallandale Officer Edward McGovern and others located and surrounded Mr. Ehlers who was hiding on the roof of a small building. Officer McGovern shot at Mr. Ehlers from the ground despite begging and pleading from Mr. Ehlers for the HBPD officers not to shoot. Willis Morgan, who lived adjacent to the location where Mr. Ehlers was cornered, called 911 and reported a domestic violence incident because he heard somebody screaming, "don't shoot, don't shoot", and thought it was a woman begging for her life and that her husband was going to kill her. Twenty seconds later, Officer McGovern shot Mr. Ehlers three times killing him. Officer Witness Willis Morgan contradicted Officer McGovern's verbal account stating that, "In the minute that led up to the shooting, never did I hear anyone say, 'Get your hands up, get your hands up.' Nor did I hear

anyone say, 'Do not reach, do not reach down, don't reach.' Had I heard an exchange like this, I would have never thought this was a domestic dispute with a very angry male." Despite this and other conflicting evidence, Officer McGovern was cleared of any wrongdoing. The Estate of Mr. Ehlers brought a federal lawsuit against the CITY and the involved officers in the United States District Court for the Southern District of Florida, CASE No.: 0:13-cv-62461-RNS. The Estate alleged counts of violation of Mr. Ehlers constitutional rights pursuant to 42 U.S.C. § 1983 against all parties, as well as Wrongful Death. Specifically, as to the CITY, it was alleged that the CITY had a deliberate indifference for the rights of persons who might be killed by the police officers of the HBPD who have been inadequately trained, supervised, and disciplined. The Estate further alleged that the CITY failed to implement any policies or programs to properly train HBPD officers or otherwise intentionally failed to protect the public, from the danger posed by HBPD officers. This matter was ultimately settled with a Motion to Approve Settlement involving Minor Children indicating that the total monetary amount paid by the CITY was $150,000.00. More than two years later CITY leaders met to decide what to do about Mr. Ehlers case. During the meeting, City officials sounded more eager to be absolved of responsibility than to determine the truth—Mayor Joy Cooper asked City Attorney Whitfield if an outside department should be hired to investigate the shooting:

| | |
|---|---|
| Cooper: | Even though it's our internal investigation, would it behoove us to do another? |
| Whitfield: | No, no, it would not. I would leave it alone at this point. Because you don't want them saying, 'Oh, look, they're trying to, you know...' |
| Cooper: | Yeah, [they've] already gone through the process in terms of it's not required. I never asked that question. |

c.  On September 6, 2012, Eduardo Prieto, was stopped by Hallandale Officers

29

Timothy Church, Brian Hubbert and Raymond Buckley after it was reported that Mr. Prieto had pulled a knife on a Walmart security guard who had confronted him for stealing some DVDs. Police located Mr. Prieto's vehicle and surrounded his vehicle in a parking lot. Once Mr. Prieto's car was stopped, according to a witness, Mr. Prieto complied with orders to raise his hands and put his hands outside the window. Notwithstanding, Mr. Prieto's compliance, the three officers, who were not in close proximity to Mr. Prieto's hands, opened fire and killed him. More than twenty rounds were fired into the car. The investigation into the shooting death of Mr. Prieto has not yet been completed by the HBPD. The failure to complete the investigation in a timely matter is itself a direct result of FLOURNOY'S insufficient policies and practices as set forth in detail below. Officer Buckley was one of the SWAT team members who participated in the raid on HOWARD Jr.'s. home. The Estate of Mr. Prieto brought a civil lawsuit against the CITY, the Police Department, and Walmart in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, CASE No.: CACE 14-017003(02). The Estate alleged that the CITY and HBPD was responsible for the Wrongful Death of Mr. Prieto. Specifically, as to the CITY, it was alleged that the CITY failed to properly train their officers casing the officers to be trigger happy and fire more than 20 rounds into Mr. Prieto's vehicle, which was boxed in and posing no immediate harm to the officers or anyone else. This matter is still pending.

　　　　d.　On April 4, 2013, Travis Dixon and Thaddeus Holmes, both African-American, were burglarizing a home when several Hallandale Officers responded and caught them in the act. Mr. Dixon and Mr. Holmes fled to their car parked in front of the home. As many as eight officers surrounded the vehicle pointing their firearms. Hallandale Beach Officer Kevin Hebert was positioned several feet away from the car and facing the driver's side window. Despite not observing any movement that posed an imminent threat to his or any other officers' safety, Officer

Hebert continued to keep his firearm trained on the front passenger compartment without shooting. After a prolonged period of time, Hebert then opened fire. At the time he did so, Dixon had made no immediate move or threat to justify the use of lethal force. No other officers present, who were in a superior position to observe the movements inside the passenger area, observed any movement by Dixon either while Hebert claimed to observe such movement, or at the time Hebert began shooting. Despite the conflicting officer accounts and actual evidence on scene, the officer was cleared of any wrongdoing, did not face any discipline, and public statements were issued by HBPD spokesperson indicating that Officer Hebert was "forced to shoot." This would be the first of two shootings that Officer Hebert was involved in, neither of which would result in discipline, training, or review.

   e. On November 17, 2013, Officer Timothy Church observed Rashad Edwards, an African-American, exit his car and engage in a conversation with acquaintances. At the time Mr. Edwards was carrying a rifle. Other than the fact that he was carrying a weapon Mr. Edwards did nothing to raise any suspicion or concern of criminal activity. After he entered into his car other officers called to the scene drove their cars intentionally in the path of Edward's vehicle causing a crash. Then officers, using the pretext of necessary use of deadly force shot Edwards. The police investigation failed to determine that Officers Andrew McClelland and Eric Bruce intentionally caused the collision between their police vehicles and that of Edwards. Further, the reasons given by both officers for the claimed necessary use of deadly force against Edwards was unsupported by the available evidence. Instead, the investigation unreasonably relied on the statements given by these officers, without scrutiny or comparison to all the available information.

   f. On March 13, 2014, Julian Carson, an African-American, was the target of a criminal investigation, which ultimately led to his arrest by the City of Hallandale Beach Police

Department. At the time of the arrest Mr. Carson was in his car wedged between a concrete wall and a police car. Hallandale Officer Kevin Hebert, the officer previously involved of Travis Dixon, exited the police car and shot Mr. Carson although it was clear that Mr. Carson presented no immediate threat of harm to the officers present or the public. Spokespersons on scene yet again immediately cleared Officer Hebert of any wrongdoing without any investigation into the reasoning or justification of his use of force, and issued a statement that he was "forced to open fire". Again, Officer Hebert received no additional training and was not counseled or disciplined despite the contrary evidence and the questionable use of deadly force.

     53.    In addition to the above referenced instances of deadly force, HBPD officers have been involved in numerous instances of non-lethal force and unlawful arrests which also indicate a culture and environment where HBPD officers feel comfortable in the knowledge that they can violate the rights of Hallandale Beach Residents, most particularly African Americans, without fear of scrutiny, discipline or criminal charge. Some of the incidents and investigations involved include:

     a.   On or about July 3, 1996, Officers Michael Fowler, Gilberto Hernandez, and Christopher Hock, arrested the nephew of Leroy Taylor for shooting off fireworks. Mr. Taylor approached the officers and pleaded that his nephew was not the only one shooting fireworks, everyone was. Officers Fowler and Hernandez proceeded to yell racial slurs at Mr. Taylor and then grabbed Mr. Taylor, an African American man, pushed him against the trunk of the patrol car, and viciously beat him with their hands. Mr. Taylor was initially handcuffed but Captain Hock instructed the officers to apologize and release Mr. Taylor. Mr. Taylor required emergency attention but he was told if he went to the emergency room, he would be taken to jail. Mr. Taylor filed a complaint with the Hallandale police department which he later learned was "thrown away"

and not investigated. Mr. Taylor brought suit against the CITY and the involved officers in in the United States District Court for the Southern District of Florida, CASE No.: 0:00-cv-06430-ASG. Mr. Taylor alleged violation of Mr. Taylor's constitutional rights pursuant to 42 U.S.C. § 1983 against all parties.

      b.  On or about January 11, 2000, HBPD were investigating a hit and run accident resulting in the death of a pedestrian and significant injuries to another pedestrian. The perpetrator was described as a black man with dreadlocks. A photo lineup was presented to the injured pedestrian who was on strong medications and still in shock from her injuries. As a result, she identified Ladson Marvin Preston as the perpetrator. Preston was thereafter arrested without any independent corroboration of the pedestrian's identification. In so doing, HBPD broke into Mr. Preston's home, arrested him, and charged him with murder and attempted murder. Although also black, Mr. Preston did not even have dreadlocks, had an alibi for his whereabouts at the time of the hit and run, and a simple running of the vehicle registration on the abandoned car involved in the hit and run found the true subject involved. Mr. Preston remained in custody for one week despite locating the correct suspect days earlier. The arrest occurred on Martin Luther King Day. Mr. Preston brought suit against the CITY in in the United States District Court for the Southern District of Florida, CASE No.: 0:00-cv-07118-WPD. Mr. Taylor alleged violation of Mr. Taylor's constitutional rights pursuant to 42 U.S.C. § 1983 including false arrest/imprisonment, malicious prosecution, abuse of process, and failure to train/supervise its officers. Mr. Taylor specifically alleged that the CITY has a pattern, custom, and/or practice which has resulted in persons being falsely arrested and unjustly incarcerated and that the CITY permitted its officers to be involved in criminal investigations without adequate training or supervision.

      c.  On or about August 5, 2002, HBPD Officer George Davis and Jason Budnick

knocked on the door of Dwayne Shepard's residence as he was eating dinner. When Mr. Shepard opened the door, the officers indicated that they were there to arrest him. Mr. Shepard asked to see a warrant which the officers did not have. Instead, they entered through the front door, grabbed Shepard by the arm, and pushed him into his living room and arrested him on his sofa. Mr. Shepard brought a § 1983 complaint against the Officers alleging that they unlawfully arrested him in violation of his constitutional rights when they entered his home and arrested him without a warrant or consent. The United States Court of Appeals for the Eleventh Circuit in Case # 07-11307 held "Construing the facts, as we must, in the light most favorable to Shepard, Officer Budnick violated Shepard's Fourth Amendment rights by entering his home without a warrant, pushing Shepard six feet further into his living room, and arresting him on his couch without a warrant. A reasonable officer would have had fair and clear notice that such actions were objectively unreasonable on August 5, 2002."

      d.  In April 2005, Officers Talous Cirilo and Mary Hagopian were accused and charged with using excessive force against Michael Brack while he was in HBPD custody. It was alleged that Officer Cirilo choked Mr. Brack to unconsciousness and utilized his taser six times. Although the officers were acquitted of the charges, both officers were fired from HBPD as a result of the allegations. These officers ultimately settled wrongful termination suits against the CITY as it was alleged that then HBPD Chief Thomas Magill falsified evidence and "pressured his internal affairs officers and detectives to manipulate evidence and coerce false statements out of Brack so he could fire the officers and enhance his image as a reformer."

      e.  On or about May 8, 2005, HBPD Officers Michael Fowler, Michael McKensie, Mary Hagopian, and Edward Diaz, Jr. were investigating an armed robbery in which one of the suspects escaped during arrest. The officers knew that the escaped subject's alias was "James

Napiners". Officer Fowler thereafter searched through jail records and because Hughylnd Gregory Napier name was close to "James Napiners", Officer Fowler pulled Mr. Napier's booking photograph to compare to surveillance cameras. Other than both men being African American, the booking photograph and camera footage contained distinct differences. Detective Fowler, utilizing the booking photo, was allegedly able to identify Mr. Napier as the escaped subject. Officer Fowler failed to conduct any further investigation and began searching for Mr. Napier to arrest him, enlisting the help of the above listed officers. Mr. Napier was staying at his girlfriend's home. The officers first detained the residents of the home (Mr. Napier's girlfriend and girlfriend's mother) without probable cause and in the absence of reasonable suspicion. Once questioned, the residents advised that Mr. Napier was sleeping upstairs. Without consent, lawful authority or a warrant, the HBPD Officers conducted a search of the residence. The HBPD officers without any warning utilized a police K-9 to apprehend a sleeping Mr. Napier, who was awoken when the K-9 forcibly bit Mr. Napier's right leg. Mr. Napier suffered severe injuries and permanent neurological damages. Mr. Napier and the residents of the home brought suit against the CITY and the individual officers in in the United States District Court for the Southern District of Florida, CASE No.: 0:09-cv-60684-UU. Mr. Napier alleged violation of his constitutional rights pursuant to 42 U.S.C. § 1983 including false arrest/imprisonment, unlawful search, false arrest, invasion of privacy against the CITY and the individual officers. Mr. Taylor specifically alleged that the CITY has a pattern, custom, and/or practice which has resulted in persons being falsely arrested and unjustly incarcerated and that the CITY permitted its officers to be involved in criminal investigations without adequate training or supervision. Although the terms of the settlement are not known, the parties filed a Stipulation of Dismissal with the Court indicating that the action had been amicably resolved and settled between the Plaintiffs and the Defendants.

f.   On or about July 3, 2008, Shaun Hope was pulled over by HBPD Officers Michael Haire and Jamie Herna for allegedly having no brake lights and otherwise running a stop sign. Without justification or cause, the officers proceeded to conduct an unauthorized search of Mr. Hope and thereafter attacked and beat Mr. Hope. Mr. Hope's wife arrived on scene to witness the officer's attacking Mr. Hope. When she sought to identify herself as Mr. Hope's wife, she was immediately arrested for obstruction of justice and taken into custody. Mr. Hope was also arrested, but due to his injuries first required inpatient medical treatment. The Hopes brought suit against the CITY and the individual officers in in the United States District Court for the Southern District of Florida, CASE No.: 1:12-cv-22475-WJZ. The suit alleged counts of violation of the Hope's constitutional rights pursuant to 42 U.S.C. § 1983, battery, and malicious prosecution.

g.   On or about October 30, 2009, HBPD Officer Josue Hernandez pulled over Kenneth Salazar for an alleged traffic offense of improper change of lane. Officer Hernandez ordered Mr. Salazar out of his vehicle and to place his hands on top of the car. Officer Hernandez then proceeded to kick Mr. Salazar causing him to lose his balance. When Mr. Salazar adjusted his footing, Officer Hernandez turned Mr. Salazar around and punched him in the face. Thereafter, Officer Hernandez kneed Mr. Salazar in the chin, and continued to pummel Mr. Salazar as he fell to the ground. Officer Hernandez also pepper sprayed Mr. Salazar while he was on the ground. At no time did Mr. Salazar resist arrest or make any offensive actions toward Officer Hernandez. Notwithstanding the true events which occurred, Officer Hernandez arrested and charged Mr. Salazar with Resisting an Officer without Violence. Mr. Salazar brought suit against the CITY and Officer Hernandez in in the United States District Court for the Southern District of Florida, CASE No.: 0:12-cv-61175-KMW. The suit alleged counts of violation of the Mr. Salazar's constitutional rights pursuant to 42 U.S.C. § 1983, battery, false arrest and malicious prosecution. On December

18, 2013, a federal jury returned a verdict finding that HBPD officer Josue Hernandez had falsely arrested Mr. Salazar, maliciously instituted criminal proceedings against Mr. Salazar, intentionally committed acts that violated Mr. Salazar's federal constitutional right not to be subjected to excessive or unreasonable force while being arrested by a law enforcement officer, and committed battery against Mr. Salazar. As a result a final judgment was entered in the amount of $82,054.16 against Officer Hernandez and the CITY. Mr. Salazar was also awarded prevailing party attorney fees and costs.

54.    Black activists and residents have long complained that Defendant CITY and FLOURNOY have not done enough to investigate and remediate what they claim is a pattern of police abuse in the northwest section. Notification of the incidents of unlawful uses of force, detentions, arrests and police harassment against the residents of decedent HOWARD Jr.'s neighborhood, as well as complaints based on unequal enforcement of laws in the form of SWAT team raids, took the form of multiple complaints by responsible members of the City of Hallandale Beach community affected, including: parents, clergymen, community organizers, and a sitting city commissioner.

55.    On numerous occasions, Commissioner Anthony Sanders, the City's lone black commissioner, and for all intents and purposes here, both the person placing the CITY on notice, and simultaneously the CITY official receiving notice on the CITY'S behalf, has protested the discriminatory treatment of African American residents by HBPD, and stated that the City is racially divided, socially divided, and economically divided. Commissioner Sanders witnessed such racial divide firsthand when he was pulled over by HBPD officers in September 2010 while headed home from a high school football game with his teenaged sons. Unreasonably mistaking Commissioner Sanders for a suspect, the officers verbally abused his family, and thereafter, drew

their guns and demanded that he keep his hands in view outside the window. He did as instructed and told the officers he was a commissioner. After being detained for an hour, he and his sons were finally allowed to go home.

56. Natalie Strange and her husband, Stanley Crawford, attended City Commission meetings where they spoke out publically against "over-policing" in the northwest section where they live. Additionally, Ms. Strange met face-to-face with Defendant FLOURNEY in his office after HOWARD Jr.'s death, where FLOURNEY acknowledged that he was aware of deficiencies in the progress and procedures of internal affairs investigations involving police shootings and police brutality against black residents leading up to HOWARD Jr.'s death. These deficiencies have since been confirmed by an independent investigation commissioned by the CITY itself.

57. Hallandale Beach Residents Caroline Johnson, Quea Gordon, and Gloria Stoner, each regularly attended City Commission meetings, and spoke privately with Commissioners complaining of discriminatory police practices in the northwest section of the City. These women were present when such police practices against the City's African-American residents were openly presented by other members of their community, and discussed by City Commissioners at those meetings. FLOURNOY was also present when these matters were publically discussed.

58. The complaints resulted in publicized town hall-style meetings between members of the community and Defendant CITY and/or FLOURNOY, where the extent of the abuses was laid plain, and where change was demanded. These meetings are a matter of public record, attended by members of the Broward County State Attorney's Office, Broward Public Defenders Office, and nationally recognized experts in the field of law enforcement, racial profiling and police misconduct. The focus of the meeting was to address discriminatory policing in Hallandale Beach with led to the shooting death of HOWARD Jr. At one such meeting, a community leader railed

against FLOURNOY and the CITY for protecting "bad apples" in the department. FLOURNOY and CITY officials openly acknowledged they were aware of the BOWE incident and complaints of the longstanding pattern of over-policing and a pattern of abuse.

59.     Most recently, on or about March 9, 2017 a meeting was held at the Foster Park Community Center in Hallandale Beach, Florida where FLOURNOY was called upon by members of the public to answers questions regarding the police operation which resulted in the killing of HOWARD Jr." FLOURNOY was also asked to explain the HBPD's year's long history of refusal to properly investigate the department's discriminatory and prevalent pattern of rights violations against persons living in the CITY'S northwest quadrant.   In responding to these questions FLOURNOY openly stated that the killing of HOWARD Jr. was the result of established HDPB policies that were "not sufficient" to prevent the incident and "needed to be changed." FLOURNOY also acknowledged a history of inadequate investigations into citizens' complaints and grievances of discrimination and civil rights violations, stating that he was aware that the HDPD's Internal Affairs Unit needed to be revamped, and additional training provided, to address the inadequacies. FLOURNOY further stated that the failures of policy leading to HOWARD Jr.'s death were being reviewed by the HBPD. However, when confronted with the fact that he had personally signed off on the Internal Affairs report which falsely found the use of force against HOWARD Jr. to be justified FLOURNOY had no response.

60.     As evidenced by an independent report commissioned by the CITY as a result of the killing of HOWARD Jr., to investigate deficient policies and practices within the HBPD police department ("Report"),[2] neither Defendant CITY nor FLOURNOY took any action to remediate

---

[2] Report submitted on November 16, 2015, by the consulting firm Greenwood & Streicher, LLC.

the policies, practices, training or supervision of the HBPD and its officers causing a wide range of abuses. Specifically, the report noted the following deficient policies and practices which were in effect at the time of this incident:

a.   Policy and Procedures were "noticeably absent of any discussion about de-escalation tactics and/or other methods which could be useful in avoiding the necessity to use force;

b.   HBPD did not provide training to its members regarding de-escalation of force and ways to avoid using force;

c.   HBPD policies and procedures did not mandatorily require use of force incidents to be reported and that a supervisor respond and investigate said use of force;

d.   HBPD policies only required investigation of deadly force when a person is killed or injured, not any time deadly force is utilized by an officer;

e.   HBPD was found to have a deficient amount of annual, in-service training for its officers;

f.   HBPD did not have any crisis intervention training for its officers;

g.   HBPD did not have a crisis intervention team;

h.   It was recommended that HBPD officers implement and mandate that all officers be required to demonstrate proficiency with their firearms twice annually, rather than once annually;

i.   It was determined that there was "room for improvement" in Internal Affairs functioning;

j.   The Internal Affairs department was found to be deficiently staffed;

k.   There were no Standard Operating Procedures (SOPs) for the Internal Affairs

department;

l.   Policies and Procedures of HBPD did not mandate that department personnel accept, record, and properly classify all complaints by members of the public which allege misconduct on the part of HBPD employees; and

m.  HBPD did not have an early-intervention system to determine if an officer has been involved in repeat use of force incidents.

The Report further stated that during the town hall meetings conducted with Hallandale Beach residents, the most often mentioned issues of concern about the HBPD were an expressed desire for better relationships between the police and the public, officers unnecessarily pointing their weapons at people, the citizen complaint process not adequately addressing public concerns, and numerous requests for Body Worn Cameras[3] on police.

61.   Left to his own devises by an indifferent Defendant CITY and FLOURNOY chose, or knowingly permitted and adopted, a course of conduct which resulted in a pattern of unlawful uses of force, illegal detentions and arrests, and selective enforcement of laws by HBPD officers, that were racially motivated or targeted a specific geographic area of the CITY. Such manifestations of racial profiling essentially treat race as evidence of crime, targeting certain segments of the City as potential criminal offenders solely by virtue of their race. Thus, through racial profiling, HBPD not only racialize crime by assuming most crimes are committed by minorities, they also criminalize race.

62.   The policy, practices, and customs of HBPD was manifested by inadequate training, supervision and accountability controls to ensure HBPD officers adhered to the mandates

---

[3] The majority of Hallandale Beach cops — 67 percent of the rank and file — oppose the cameras, according to a survey funded by the police union.

of the U.S. Constitution, local laws, and other applicable HBPD written policies - for which FLOURNOY was directly responsible. The result was an atmosphere which allowed HBPD officers to commit rights violations with impunity knowing that their actions would not be adequately or meaningfully scrutinized, and that they would not be disciplined or suffer any negative consequences.

63.    The death of HOWARD Jr., the arrest of his sixteen-year-old son, HOWARD III, and the shooting of a docile family pet, were the result of these policies, practices, customs, and/or procedures authorized and condoned by Defendant CITY leaders and its *de facto* HBPD final policy-maker, FLOURNOY.

64.    HOWARD Jr. was shot and killed by Defendant MCKENZIE in the kitchen area of his home unarmed and he was neither posing an objective threat to the safety of Defendant MCKENZIE, nor was he acting in a manner that any reasonable officer might perceive as a threat. The shooting occurred after a group of officers attempting to execute a search warrant in a military-style raid committed a series of errors resulting in unnecessary confusion and chaos among the officers and causing Defendant MCKENZIE to panic and resort to deadly violence.

65.    In accord with its longstanding practice of meaningless and biased review and investigation of police misconduct against African American residents in the northwest section of the City, the actions of every officer involved in the events surrounding HOWARD Jr.'s death were found to be justified or excusable.

## C.    FAILURE OF POLICY

66.    At all times material hereto the Defendant CITY and FLOURNOY were charged with the plenary responsibilities and duties to adopt and implement rules and regulations for the employees and agents of the HBPD.

67.     The rules and regulations which Defendant CITY and FLOURNOY were charged to adopt and implement included: policies, procedures, customs and/or practices which were intended to prevent the excessive use of force, unlawful arrests, racial profiling and/or unequal protection or enforcement of laws to all persons in the City.

68.     At all times material hereto, Defendant CITY and FLOURNOY, by the acts of HBPD employees and/or agents, permitted, tolerated and/or caused a pattern and practice of unlawful use of force and unlawful seizures or arrests against members of the public by officers of the HBPD.

69.     The pattern and practice of unlawful use of force and unlawful seizures and/or arrests against members of the public by officers of the HBPD share common characteristics or themes in that in each instance the officer(s):

    a.  employed force or control measures which were excessive or without any reasonably objective threat to the safety of officers or the safety of any other person;[4] and/or

    b.  caused the arrest or detention of individuals without probable cause or a reasonable articulable suspicion of criminal activity; and/or

    c.  failed to adhere to written rules or regulations intended to prevent excessive force; and/or unlawful arrest; and/or

    d.  failed to accurately report the circumstances surrounding the use of force, control measures, arrests or detentions;

    e.  did falsify official reports to conceal that such actions were unjustified, unnecessary, illegal or violated rules and regulations; and/or

---

[4] On January 4, 2016, HBPD officers arrested, handcuffed and took two second-graders, a 7-year old and 8-year old, to juvenile hall for allegedly trying to steal a 10-year-old's bike; both boys were African-American.

f.   caused the arrest or detention of individuals or otherwise entered a dwelling without a warrant, consent, or other lawful authority.

70.   Defendant CITY and FLOURNOY, acting through the HBPD Internal Affairs Division, ratified and declared within policy the unconstitutional actions of the officers' actions by conducting inadequate investigations. In each instance the internal investigation or review of the officers' actions conducted by HBPD was flawed where Defendant CITY and/or FLOURNOY failed to create policies, procedures or practices to adequately investigate these abuses by CITY officers. These inadequacies included, but were not limited to:

a.   the failure to provide written guidelines which mandate how an investigation should be conducted;

b.   the failure to provide instructions on the information that is necessary to complete a fair and impartial IA investigation and report;

c.   the failure to provide minimally sufficient staffing to conduct the investigations;

d.   the failure to provide adequately trained or experienced staff to conduct the investigations;

e.   the failure to provide adequate supervision of the staff charged with the investigations, or auditing of the investigations;

f.   the failure to employ any type of external oversight or auditing system of the IA process; and

g.   the failure to timely conclude investigations to permit external scrutiny;

71.   Additionally, Defendant CITY and/or FLOURNOY chose a course of conduct, custom and/or practice:

a.   by accepting and approving investigations that they knew, or should have

known, were deficient and biased, in that the investigations routinely:

    i.  accepted the statement of the officer(s) involved without scrutiny;

    ii.  failed to interview all available witnesses;

    iii.  failed to identify conflicts between the statements of witnesses, including officers;

    iv.  failed to identify conflicts between statements of witnesses (including officers) and other available evidence;

    v.  failed to consider all easily and readily available evidence;

    vi.  were conducted in a manner intended to exonerate the officer(s) involved; and/or

b.  that failed to identify, supervise, train, discipline or control officers who committed such abuses; and/or

c.  of selective enforcement of laws against persons of color and/or lower socio-economic status by targeting certain areas of the CITY for investigation of offenses, including the execution of search warrants; and/or

d.  failed to identify and remediate discriminatory racial profiling by HBPD officers resulting in such abuses; and/or

e.  which tolerated criminal activity in areas of the CITY traditionally inhabited by persons who are white and of higher economic status.

72.    The CITY's and FLOURNOY's deliberate indifference towards HOWARD Jr. and other unarmed and non-threatening persons in Hallandale Beach, particularly black persons, led to deadly force being used against HOWARD Jr. and Tank, and the use of excessive force and unlawful detention of HOWARD III.

73.     The policies, customs, and practices of deliberate indifference complained of include, but are not limited to, the following:

a.   Deliberate indifference by failing to adequately screen deputies and by failing to follow hiring protocols for sworn law enforcement officers;

b.   Deliberate indifference by failing to institute an appropriate policy for the detention of unarmed and non-threatening persons and by failing to enforce such a policy, if such a policy was in place;

c.   Deliberate indifference by failing to institute an appropriate policy for the de-escalation of force and the better identification of techniques which may help to avoid the necessity to use force;

d.   Deliberate indifference by failing to ensure that CITY employees were sufficiently trained or otherwise educated in the extension and management of non-threatening arrests from the perspective of the arresting officer(s), dispatch officers and supervising or managing officers;

e.   Deliberate indifference by failing to provide sufficient supervision of the use of deadly force in question and by failing to monitor the force in question;

f.   Deliberate indifference by failing to require all use of force incidents to be reported;

g.   Deliberate indifference by improperly training CITY officers in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict death or harm upon persons being arrested;

h.   Deliberate indifference by improperly training CITY officers in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict death or harm upon unarmed and non-threatening persons they encounter;

i.   Deliberate indifference in failing to properly supervise CITY officers in their encounters with persons they arrest;

j.   Deliberate indifference in failing to have Officers properly reviewed for accurate use of force of incidents involving force used against arrested persons and unarmed or non-threatening persons, with conclusions frequently permitted to be drawn on the basis of clearly incorrect or contradictory information; and

k.   Deliberate indifference in failing to determine whether said employees, including the named individual Defendants, posed a threat to the public as a result of their propensity to commit unlawful acts.

74.   The CITY's deliberate indifference, failure to train, failure to effectively supervise, and permission (and toleration of) the patterns and practices enumerated above, were the moving forces causing the death of HOWARD Jr. and Tank, and the excessive force utilized against HOWARD III and the violation of HOWARD Jr.'s and HOWARD III's Constitutional Rights.

**D.   SWAT TEAM RAID AND SHOOTING OF HOWARD JR.**

75.   On May 8, 2014, at about 6:00AM members of the HBPD SWAT team executed a search warrant on HOWARD Jr.'s home. At the time, the HBPD SWAT team had no knowledge of, nor did there exist, any circumstance to indicate any particularized risk of danger to officer safety associated with the execution of the warrant. The warrant required that the SWAT team knock and announce their presence and purpose before any forced entry as the HBPD had not applied for or received a "no knock" warrant based on any anticipated circumstances which would

suggest a particular threat or risk requiring extreme measures.

76.    HOWARD Jr. was not known, or suspected, by the HBPD of possessing any weapon, or being in any way violent. HOWARD Jr.'s home was not outfitted with any surveillance cameras, security equipment or fortification to suggest an elevated risk or vulnerability to officer safety as they approached the house. No time prior to, or during the SWAT raid did HOWARD Jr. or anyone associated with, or in near proximity to the home, do or say anything to elevate the operation to the level of "high risk" other than the SWAT team members themselves.

77.    The basis of probable cause supporting the application for the warrant was two (2) separate "controlled buys" at the home for a single piece of crack cocaine each time. These controlled buys entailed one or more HBPD officers giving a cooperating civilian money to knock on HOWARD Jr.'s door and buy a piece of crack cocaine

78.    Despite the lack of any knowledge that might require or cause apprehension of danger greater than that associated with the inherent risks in executing a search warrant at the home of a person known to sell small amounts of narcotics, the members of the SWAT team, including the Defendants present, committed a series of undisciplined and unnecessary actions that, except for the tragic results, could only be considered a comedy of errors creating panic and uncertainty amongst the officers as they approached and forced entry into the home.

79.    The folly exhibited by the SWAT team, which resulted in HOWARD Jr.'s death, was a direct and proximate result of the failure to institute proper training and/or supervision of SWAT team members by Defendant CITY and FLOURNOY. The obvious danger associated with the SWAT raid on May 8, 2014 was so apparent, and the need for appropriate specialized training and supervision to prevent injury so obvious, that FLOURNOY knew, or should have known, that death or great bodily injury was foreseeable.

80.     As the SWAT team members approached the back door to execute the warrant, they encountered Tank, a thirteen-year-old American Staffordshire Terrier. Tank was an important and beloved member of Plaintiffs' family; he was a sentient, loving, and good-natured companion dog who lived with Plaintiffs for almost all of his thirteen plus years. Tank had no prior history of violence and was not an aggressive or dangerous dog, as defined by the Broward County Code, Animal Care and Adoption Ordinance.

81.     Inexplicably, the SWAT team members either had no prior knowledge that they would encounter a dog, or they did have prior knowledge but failed to prepare their mission in a manner that would not trigger a succession of errors that resulted in unlawful use of deadly force. In either circumstance, a search warrant should not be a death warrant for innocent dogs.

82.     Tank's response to the officers was neither vicious nor life threatening. Tank was securely chained near the back door of the house, and was neither running loose, nor endangering persons or property. Even if Tank was barking, which he was not, it is objectively unreasonable to say that a barking dog is a real threat to an armed police officer. Nevertheless, Defendant MCKENZIE saw it fit to shoot Tank with a 12-gauge Remington 870 shotgun.

83.     Defendant MCKENZIE, as well at least one other officer then yelled out the word "compromised" intended to signal that secrecy of the SWAT team mission was no longer secure. These screams only served to further compromise the security of the officers and any potentially affected persons, like HOWARD Jr. and HOWARD III inside.

84.     As Tank laid bleeding and whimpering on the ground, Defendant HEISER aimed his Glock 22 at Tank's head and fired a second round, unnecessarily ending the life of an innocent dog, and further compromising the safety of the raid.

85.     Considering the totality of the circumstances, Defendants MCKENZIE and

HEISER's actions were not objectively reasonable. There was no need for the application of deadly force because exigent circumstances did not exist; the threat was not imminent and the killing was not a real or apparent necessity.

86.     The SWAT team had nearly a month to consider the options and tactics available for an encounter with Tank, nevertheless, they had no plan to use non-lethal methods of incapacitation, nor did they have a specific plan for isolating Tank other than by fatally shooting him.

87.     Despite three separate unnecessary and undisciplined actions which escalated the risk of danger if the mission were to proceed, the SWAT team members continued to the rear door now intent upon using even more unnecessary violent and risky tactics to gain entry into the home. This ill-advised determination was the direct result of a failure of training and supervision attributable to FLOURNOY, as well as a practice and culture of unbridled use of military style tactics against the residents of HOWARD Jr.'s neighborhood as exemplary warnings and deterrents, and as token law-and-order gestures.

88.     The warrant at issue, signed by Honorable Elizabeth Scherer in May 6, 2014, was not a "no knock" warrant, and required the SWAT team's compliance with Florida law - to "knock and announce" their presence and purpose. However, relying on their own self-created exigency, members of the team began to flail at the door trying to smash their way in. However, they were initially unable to do so, struggling with pry to tools to force a simple dead bolt. And when it became clear, or should have become clear, to the team leader Defendant HEISER that continuing to force entry, rather than abandoning the effort, would create an uncontrollable situation likely to result in great bodily harm, he determined to do so anyway.

89.     Two gun shots having been fired, several officers screaming out "compromised,"

failing to comply with the required knock and announce, and creating sounds of violent assault at the back door; it should have been clear to all of the SWAT team members, but most pertinently to Defendant HEISER as its leader, that any person inside the home would reasonably fear imminent threat of certain great bodily harm. It was incumbent upon Defendant HEISER to determine that the risk of great bodily harm to both the team members and the persons inside the home was so great and that the purpose and necessity of accomplishing the SWAT raid based on non-violent drug transactions was so minimal, the only prudent decision was to back away from the door. Despite, the obviousness of the unreasonable risk of harm already created, Defendant HEISER determined to use even more violent measures inside the home to save the rapidly devolving order of an already failed mission, namely the deployment of an explosive device.

90.     When the door was finally forced open Defendant HEISER threw in an explosive device intended to stun anyone inside.  At that point HOWARD Jr., was inside his home, wearing only his underwear, and facing the door with nothing in his hands.

91.     Defendant ALLEN later prepared and executed an affidavit intended to provide probable cause for the arrest of HOWARD Jr. falsely swearing that HOWARD Jr. was standing at the threshold of the doorway when in fact HOWARD Jr. was standing a distance away from the doorway.

92.     Upon sight of HOWARD Jr. in the kitchen area, without a moment of hesitation, and while it was clearly visible that HOWARD Jr. was defenseless, non-threatening and going down toward the floor, Defendant MCKENZIE shot HOWARD Jr. in the lower chest with a 12-gauge Remington 870 shotgun.

93.     The shotgun blast was almost simultaneous with the explosion of the stun-grenade, as team members, including Defendant HEISER, later stated they only heard one explosion.

51

94.     The shotgun slug, a heavy projectile made of lead, fractured two of HOWARD Jr.'s ribs, perforated his liver, small intestine and psoas muscle, which runs from the inner groin to the spine. Shortly after the shooting, Tyrell McFadden, HOWARD Jr.'s next door neighbor, provided a sworn statement under oath wherein he heard one of SWAT team officers say, "We killed that nigger," as he walked past his window.

95.     Eleven days later, on May 19, 2014, HOWARD Jr. succumbed to his wounds and died at Memorial Regional Hospital—the same hospital he was born in 34 years earlier.

96.     Defendant MCKENZIE later falsified sworn testimony and/or official documents stating that he saw an item in HOWARD Jr.'s possession, which he believed to be a possible weapon. HOWARD Jr. had nothing in either hand at the time Defendant MCKENZIE used deadly force. Nor did any conditions exist that might have prevented Defendant MCKENZIE from observing this.

## E.     ASSAULT OF HOWARD III

97.     After HOWARD Jr. was shot, Defendants ALLEN and HEISER entered the home, stepped over HOWARD Jr. and went into HOWARD III's bedroom. They pulled him from his bed, hit him, stomped on his back and placed him in handcuffs. They then dragged him through the house and over his father who lay bleeding on the floor, and then out the rear door forcing him to lay in the dirt with his hands cuffed behind his back. In doing so, Defendants HEISER and ALLEN caused HOWARD III extreme fear and emotional distress. After 20 minutes HOWARD III was placed into the back of a patrol car.

98.     At the time, Defendants HEISER and ALLEN assaulted HOWARD III, he had said no word or done any act toward these Defendants or in their presence which would cause any reasonable person to believe he was resisting, or caused a threat to their safety or that of anyone

else. HOWARD III was asleep, or half-asleep, in his bed the entire time.

99.     When Bowe family members realized that he was cuffed and in the back of the police car, they demanded his release and put the HBPD officers who were holding him on notice that he was only 16 years old. In response, HBPD officers simply moved the car containing the child to a different location that was inside the area marked by crime scene tape and away from his family. Another witness, Fred Webb, provided a sworn statement under oath wherein he stated that during this time, he witnessed several SWAT team officers laughing, joking, and high-fiving each other while enjoying doughnuts and coffee in front of Howard Jr.'s house.

100.     The HBPD officer who had HOWARD III handcuffed in her car then, as requested by Defendant DUBUISSON, drove HOWARD III to the police department. Defendant DUBUISSON later wrote an official report falsely stating that HOWARD III was released from police custody at the scene, and further falsely stating that HOWARD III was driven to the station by a family member.

101.     HOWARD III's aunt, Cornessa Bowe, saw the police car with her nephew cuffed inside leave the crime scene and she followed the police car in her own car. When the police car entered the HBPD headquarters, Cornessa Bowe attempted to follow the car but the security gate closed in front of her car blocking her entrance. A HBPD officer then drew his gun and told her that she had to leave and could not enter the area.

102.     Cornessa Bowe then went around the front of the police department and though the front doors and demanded to see her 16-year-old nephew. Cornessa was threatened and dismissed by the HBPD employees in the lobby for an extended period of time until finally, after she had threatened to call various news organizations and report that the HBPD was illegally holding a child, she was allowed to see HOWARD III.

103.    Defendant DUBUISSON attempted to interrogate HOWARD III after he had been held for several hours but Cornessa Bowe terminated the interrogation and left with her nephew.

## F.    CONSPIRACY TO COVER UP

104.    Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON conspired immediately following the shooting of HOWARD Jr., whereby they agreed to facilitate, justify, and support, the activity which occurred in connection with the allegations set forth above to protect themselves from civil and/or criminal liability. This conspiracy resulted in the falsification of official reports and documents, and falsification of statements in official and unofficial proceedings.

105.    Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's conduct involved a series of acts over time that were driven by similar motives, methods and strategies, including but not limited to: agreeing not to report each other after witnessing their misconduct; withholding information and falsifying official documents, reports and testimony; intentionally impeding prosecution of suit; and acting in other such ways as to conceal the unlawful acts and deprivation of the constitutional and statutory rights secured to decedent HOWARD Jr. following his death.

106.    In particular, but not excluding others, Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON knowingly, willfully, and intentionally lied about several unsupported facts by stating that:

a.    Tank, the 13-year-old family dog, was aggressive and posed a threat to their safety, and therefore had to be killed;

b.    SWAT team member Anthony DiStefano knocked on the door to announce the officers' presence, although Distefano himself stated that he did not to do a "knock and

announcement" because the search warrant was compromised;

     c.  HOWARD Jr. was non-compliant with any commands such that his resistance created a fear for the safety of the officers, although other SWAT team members did not hear any specific verbal commands being given;

     d.  HOWARD Jr. was standing at the threshold of the door posing an immediate threat to their safety, rather than a distance from the threshold where he was shot, and

     e.  HOWARD Jr. was in possession of an item that might reasonably be perceived as a weapon causing Defendant MCKENZIE to be placed in fear of imminent harm.

107.   In connection to the above conspiracy, Defendant DUBUISSON falsified official reports, documents and/or testimony which were intended to cover up the illicit nature of his conduct, including but not limited to: ordering that HOWARD III be secluded away from his family, illegally imprisoning the sixteen-year-old against his will, and stating that HOWARD III was released from custody at his home and driven to the police department by a family member for a voluntary interview.

108.   As a result, Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's version of the incident is contradictory and differs greatly from the evidence and witness testimony.

109.   Defendant CITY also conspired with Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON by:

     a.  Not conducting a proper investigation into Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's actions;

     b.  accepting Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's false narrative of events as true;

c.  ignoring the evidence and reported discrepancies that proved Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's statements and narratives were false; and

d.  not disciplining Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON.

## **FEDERAL COUNTS**

### **COUNT I**
**Unlawful Entry – Fourth Amendment Violation – 42 U.S.C. §1983**
**(Defendants HEISER, ALLEN and MCKENZIE)**

110.    Plaintiffs re-allege paragraphs 1 through 8, 13-15, 21-23, 38, 56-60, 63-65, and 72-109 and incorporate those allegations into this count.

111.    The Fourth Amendment requires that even where officers have a valid search warrant in-hand, entry into a home is unlawful where officers do not duly announce their presence and purpose. The only constitutionally recognized exception to this rule is where the warrant is a "no knock" warrant.

112.    During the SWAT team raid herein the HBPD were not in possession of a no knock warrant yet still failed take any reasonable steps to identify themselves or their purpose.

113.    HBPD SWAT member, Detective Distefano, has stated under oath that he was the officer responsible for announcing the presence of police prior to breaking down the door and that he did not announce the presence of the officers, and did not hear anyone else announce or give any commands to HOWARD Jr. before he was shot.

114.    At no time did there exist any exigency, emergency or threat to officer safety or the safety of any other person to obviate the need and/or requirement for the HBPD to knock and announce its presence and purpose before entering the home of HOWARD Jr.

115.    The search warrant being executed by HBPD was based on suspicion of only non-

violent criminal activity. Moreover, the HBPD had no knowledge or reasonable belief that HOWARD Jr., or anyone else inside the residence presented a danger to safety, or might destroy evidence.

116.    At no time did HOWARD Jr. pose an immediate threat against Defendant MCKENZIE or any member of the HBPD.

117.    This failure to knock and announce by the HBPD SWAT team was objectively unreasonable.

118.    Moreover, it was the wrongful and miscalculated acts of the SWAT team members themselves that created the conditions that led to the failure to knock and announce their presence and purpose. This failure exacerbated an already unnecessarily violent and uncertain situation, and was a direct and proximate cause of the death of HOWARD Jr. Had these Defendants either announced their presence and purpose themselves, or ensured that this was done, such that HOWARD Jr. had a reasonable opportunity to answer the knock, his death would not have occurred.

119.    As a direct and proximate result of Defendants MCKENZIE, ALLEN and/or HEISER'S failure to announce their presence and purpose prior to entry, HOWARD Jr. was killed and his children have suffered the following damages:

       a.   They have, in the past and will in the future, suffer great mental pain and suffering.

       b.   They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

       c.   They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

**WHEREFORE**, Plaintiffs demand judgment against Defendants HEISER, ALLEN and MCKENZIE for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

<u>**COUNT II**</u>
**Unlawful Use of Force against Howard Jr.**
**Fourth Amendment Violation – 42 U.S.C. § 1983**
**(Defendant MCKENZIE)**

120.    Plaintiffs re-allege paragraphs 1 through 8, 13, 21-23, 38, 56-60, 63-65, 72-96, and 104-109 and incorporate those allegations into this count.

121.    Defendant MCKENZIE's action on May 8, 2014 which resulted in the death of HOWARD Jr. occurred in the scope of his employment with the HBPD and under the color of law.

122.    Defendant MCKENZIE knew or should have known, and every reasonable officer in his position would have concluded, that there was no reason shoot HOWARD Jr. who was in his own home, in his underwear, unarmed and with both hands clearly visible.

123.    Defendant MCKENZIE had a legal duty to use only that amount or degree of force against HOWARD Jr. as was reasonable and necessary under the circumstances. Pursuant to national police standards, and federal and state constitutional law, a police officer cannot use "excessive force," often defined as a level of force inappropriate to the circumstances, against members of the public.

124.    On May 8, 2014, Defendant MCKENZIE used an excessive and unnecessary amount of force against HOWARD Jr., which was objectively unreasonable in light of the facts and circumstances confronting Defendant MCKENZIE. Defendant MCKENZIE knew or should have known, and every reasonable officer in that position would have concluded, that the force he used against HOWARD Jr. was unlawful.

125.    Defendant MCKENZIE violated HOWARD Jr.'s constitutional rights to be secure in his person, free from unreasonable seizure and from the use of excessive force.

126.    These violations were of a type and character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established.

127.    Defendant MCKENZIE acted knowingly, intentionally, and maliciously, and/or with a   reckless or callous indifference to the federally protected rights of HOWARD Jr.

128.    Defendant HEISER's conduct was so closely related to the deprivations which occurred as to be the moving force and proximate cause of the death of HOWARD Jr. and the unlawful arrest of HOWARD III.

129.    As a direct and proximate result of Defendant MCKENZIE's violation of HOWARD Jr.'s civil rights, HOWARD Jr. died an unnecessary and painful death over a period of eleven days.

130.    Plaintiffs, HOWARD BOWE Sr. and BELINDA RAMOS, as the co-personal representative of the estate of HOWARD Jr., claim damages for the wrongful death of HOWARD Jr. caused by the violation of rights alleged herein. Said damages include: loss of the prospective net accumulations of an estate, which might reasonably have been expected but for his wrongful death, reduced to present money value as the survivors of the decedents' include lineal descendants, and for funeral and burial expenses under 42 U.S.C. §1983 and the Florida Wrongful Death Statute.

131.    As a direct and proximate result of the acts of Defendant CITY, decedent HOWARD Jr.'s survivors, Plaintiff HOWARD III, a surviving son, NB, a minor surviving son, and HB, a minor surviving daughter, have sustained the following damages:

a.  They have, in the past and will in the future, suffer great mental pain and suffering.

b.  They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

c.  They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

**WHEREFORE**, Plaintiffs demand judgment against Defendant MCKENZIE for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

**COUNT III**
**Unlawful Use of Force against Howard III**
**Fourth Amendment Violation – 42 U.S.C. § 1983**
**(Defendants HEISER and ALLEN)**

132.   Plaintiffs re-allege paragraphs 1 through 8, 14, 15, 21-23, 38, 56-60, 63-65, 72-79, and 97-109, and incorporate those allegations into this count.

133.   While acting under the authority of the State of Florida and under color of law as police officers in the employ of Defendant CITY and HBPD, Defendants HEISER and ALLEN subjected HOWARD III to the deprivation of the rights and privileges secured to him by the Constitution of the United States including the constitutional right not to be subjected to unreasonable and excessive force.

134.   The force used by Defendants HEISER and ALLEN against HOWARD III during the course of HOWARD III's arrest was objectively inhuman and unnecessary, and constituted the unreasonable and excessive use of force in violation of HOWARD III's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

135.     Defendants HEISER and ALLEN committed the acts described hereinabove in a gross disregard of HOWARD III's constitutional rights while acting under color of law, and specifically deprived HOWARD III of his constitutional right to be free from excessive police force under the Fourth Amendment.

136.     As a direct and proximate result of the conduct of Defendants HEISER and ALLEN, HOWARD III suffered loss of his liberty, humiliation, and mental anguish.

**WHEREFORE**, Plaintiff HOWARD III, demands compensatory and punitive damages against Defendants HEISER and ALLEN, costs, and such other and further relief as the Court deems appropriate.

**COUNT IV**
**False Imprisonment/Arrest of Howard III – Fourth Amendment – 42 U.S.C. § 1983**
**(Defendant DUBUISSON)**

137.     Plaintiffs re-allege paragraphs 1 through 8, 16, 21-23, 38, 56-60, 63-65, 72-79, and 97-109 and incorporate those allegations into this count.

138.     At all times material hereto, the detention and/or imprisonment of HOWARD III at the direction and caused by Defendant DUBUISSON was objectively unreasonable, violated a clearly established constitutional right, and was the result of plain incompetence and/or deliberate indifference to HOWARD III's rights.

139.     More specifically, there existed no reasonable suspicion or probable cause to believe that HOWARD III had committed or was engaged in any criminal activity to justify his continued placement in handcuff in a police car, and transport to the HBPD police station without his consent, which did not exist.

140.     Instead, the imprisonment or arrest was motivated by an intent to secret the boy from his family and/or to intimidate him, as part of a malign attempt to control the facts and

information regarding the death of his father to protect other HBPD officers from discipline and even criminal charges.

141.    Prior to the detention of HOWARD III, Defendant DUBUISSON was informed of the facts and circumstances regarding the shooting death of HOWARD Jr.

142.    In the alternative, the imprisonment or arrest was the result of plain incompetence for which the Defendant is disentitled to any degree of immunity

143.    As a direct and proximate result of the illegal detention and false imprisonment of HOWARD III by Defendant DUBUISSON he suffered loss of freedom, incarceration, imprisonment and emotional harm.

**WHEREFORE**, Plaintiff HOWARD III seeks entry of this Court's order of final judgment against Defendant DUBUISSON for compensatory and punitive damages incurred, attorney's fees, costs, and such other relief that the Court deems just and proper.

<u>COUNT V</u>
**Supervisory Liability – Directing Unlawful Acts – Fourth Amendment – 42 USC § 1983**
**(Defendant HEISER)**

144.    Plaintiffs re-allege paragraphs 1 through 8, 14, 21-23, 38, 56-60, 63-65, and 72-109 and incorporate those allegations into this count.

145.    On May 8, 2014, Defendant HEISER, acting as the team leader and under the color of law, was responsible for directing the actions of the HBPD SWAT team.  Defendant HEISER had the authority, ability and concurrent duty to prevent the unlawful acts which occurred during the raid. However, he failed to do so.

146.    Specifically, Defendant HEISER directed and set in motion a series of acts by his subordinates that he knew, or should have reasonably known, would cause the subordinates conduct to result in the deprivations of constitutional rights and violations of law, and/or Defendant

HEISER knew, or reasonably should have known, that his subordinates conduct would deprive HOWARD Jr. and HOWARD III of their constitutional right, and Defendant HEISER's failure to act to prevent his subordinates from engaging in such conduct.

147.    At all times material hereto, Defendant HEISER showed a reckless or callous indifference to the deprivation by his subordinates of the rights of HOWARD Jr. and HOWARD III.

148.    Furthermore, Defendant HEISER was present and had an opportunity to intervene and stop his subordinates from engaging in such conduct.

149.    Defendant HEISER stood by and watched each of the above described events unravel and failed to intervene or otherwise attempt to diffuse the situation.  Defendant HEISER failed to take necessary steps to protect HOWARD III from his subordinates' unconstitutional use of excessive force although he was in a position to do so.

150.    Defendant HEISER had ample time and ability to intervene and prevent the use of excessive force against HOWARD III.

151.    A police officer's duty to intervene when the officer directs his subordinates to perform and witnesses the use of unconstitutional excessive force with the time and ability to intervene was clearly established on May 8, 2014.

152.    Defendant HEISER'S conduct was so closely related to the deprivations which occurred, and created such a degree of danger as set forth in detail above, as to be the moving force and proximate cause of the death of HOWARD Jr. and the unlawful arrest of HOWARD III.

**WHEREFORE** Plaintiffs seeks entry of this Court's order of final judgment against Defendant HEISER for compensatory and punitive damages, attorney's fees, costs, and such other relief that the Court deems just and proper.

<u>**COUNT VI**</u>
**Unreasonable Search and Seizure- "Tank" the dog**
**Fourth Amendment Violation – 42 U.S.C. § 1983**
**(Defendants MCKENZIE and HEISER)**

153.    Plaintiffs re-allege paragraphs 1 through 8, 13, 14, 21-23, 38, 56-60, 63-65, 72-87, and 104-109 and incorporate those allegations into this count.

154.    Defendants MCKENZIE and HEISER abused their power and engaged in an excessive use of force in violation of the Fourth Amendment to the Constitution of the United States.

155.    The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, paper, and effects, against unreasonable searches and seizure, shall not be violated . . ."

156.    Defendant CITY and FLOURNOY, in blatant disregard of the property rights and safety interests of its residents, have failed and/or refused to adopt policies or procedures to protect the Fourth Amendment rights of its residents regarding the use of lethal force on domestic animals.

157.    When Defendants MCKENZIE and HEISER shot, and killed Tank, they meaningfully interfered with Plaintiffs' possessory interest in their property.

158.    Defendants MCKENZIE and HEISER knew or should have known and understood that Plaintiffs had a constitutionally protected property interest in Tank. The Plaintiffs' "right to be secure" from arbitrary seizure was totally disregarded by Defendants MCKENZE and HEISER. Defendants MCKENZE and HEISER engaged in the type of high-handed, Draconian, arbitrary manner that the Fourth Amendment was intended to protect against.

159.    Considering the totality of the circumstances, Defendants MCKENZIE and HEISER's actions were not objectively reasonable. There was no need for the application of force because Defendants MCKENZIE and HEISER were not under attack. Moreover, any danger that

these Defendant perceived, rightly or wrongly, was caused solely by their own actions, specifically, failing to follow established policy for preparation of SWAT operation, and/or refusing to recognize the consequences of their ill planned tactics.

160.     Defendants MCKENZIE and HEISER unreasonably wantonly, intentionally, knowingly, recklessly, and excessively used unnecessary force without any reasonable justification or probable cause in shooting and killing Tank.

161.     As a direct and proximate result of Defendants MCKENZIE and HEISER's actions, Plaintiffs have been damaged in various respects including being permanently deprived of the property value and companionship of Tank, as well as suffering severe mental and physical anguish due to the egregious nature of their loss.

**WHEREFORE**, Plaintiffs demand judgment against Defendants MCKENZIE and HEISER for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

<u>**COUNT VII**</u>
**Official Policies and/or Practices Resulting in Unequal Protection of Laws**
**Fourteenth Amendment – 42 U.S.C. §1981 as to Howard Jr.**
**(Defendant CITY)**

162.     Plaintiffs re-allege paragraphs 1 through 109, and incorporate those allegations into this count.

163.     Decedent HOWARD Jr. was an African-American male and a citizen of the United States.

164.     Defendant CITY and FLOURNOY violated the right of decedent, HOWARD Jr., to be subject to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

165.     At all times material hereto Defendant CITY and FLOURNOY maintained a practice and custom of condoning SWAT team raids in the execution of search warrants that were disproportionately targeting members of the African-American community where HOWARD Jr. lived for purposes which were illegal as they constituted the selective and discriminatory enforcement of law.

166.     On May 8, 2014 the SWAT team raid against HOWARD Jr. was also the result of this malign practice and custom, and therefore denied HOWARD Jr. of such rights to equal treatment, equal opportunities of due process as those afforded to white persons in comparable situations, and equal security in his personhood and welfare.

167.     Defendant CITY and FLOURNOY, deprived decedent HOWARD Jr. of the aforesaid constitutional rights to equal treatment, based in part upon decent HOWARD Jr.'s race as an African-American.

168.     As a consequence of Defendant CITY and FLOURNOY'S wrongful actions, willful neglect, callous indifference, negligent behavior, and violation of state and federal laws, decedent HOWARD Jr. was deprived of his right to be free of such unlawful, race-based treatment secured to him by provisions of the due process clause of the Fifth and Fourteenth Amendment; the equal protection clause and the Fourth Amendments to the United States Constitution as well as the protections afforded under 42 U.S.C. § 1981.

169.     These deprivations were the moving force, and the direct and proximate cause of the death of HOWARD Jr. on May 8, 2014.

**WHEREFORE**, Plaintiffs demand judgment against Defendant CITY for compensatory damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate

**COUNT VIII**
**42 U.S.C. § 1985 Claim for Conspiracy to Interfere with Civil Rights**
**(Defendants MCKENZIE, ALLEN, HEISER and DUBUISSON)**

170.    Plaintiffs re-allege paragraphs 1 through 8, 13-16, 21-23, 38, 56-60, 63-65, and 72-109, and incorporate those allegations into this count.

171.    Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON, acting under color of law, individually and collectively, by way of their actions, omissions and conduct as alleged and set forth in the preceding paragraphs, did conspire to deprive decedent HOWARD Jr. and HOWARD III of their Fourth, Fifth, and Fourteenth Amendment rights, and jointly caused such deprivation of rights by acting in concert to unlawfully deny decedent HOWARD Jr. and HOWARD III equal rights and privileges of the law.

172.    Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's conspiracy also constituted a criminal conspiracy in violation of 18 U.S.C. § 241 and 18 U.S.C. § 242, notwithstanding the extent to which the conspiracy alleged is intra-corporate in nature.

173.    As set forth in the preceding paragraphs, Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's acted individually and in concert to perform or cause to be performed certain acts in furtherance of the goal and object of the conspiracy, thereby depriving HOWARD Jr. and HOWARD III of certain rights guaranteed to them under the Constitution as citizens of the United States.

174.    Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's actions were willful, wanton and intentionally directed to harm HOWARD Jr. and HOWARD III.

175.    Defendants MCKENZIE, ALLEN, HEISER and/or DUBUISSON's actions were reckless and taken in willful disregard of the likely outcome and consequence of their actions.

176.    As a direct and proximate result of the acts alleged above, Plaintiffs HOWARD III

and the other minor children of HOWARD Jr, have suffered extreme mental anguish, and loss of enjoyment of their lives which will continue into the future.

**WHEREFORE**, Plaintiffs HOWARD III and the other minor children of HOWARD Jr. seek compensatory and punitive damages against Defendants MCKENZIE, ALLEN, HEISER and DUBUISSON, as well as attorney's fees, costs, and all other relief that the Court deems just and proper.

**COUNT IX**
**Policies and/or Practices and Customs Resulting in Improper and Excessive Use of Force**
**Fourth Amendment – 42 U.S.C. § 1983 as to Howard Jr. and Howard III**
**(Defendant CITY)**

177.    Plaintiffs re-allege paragraphs 1 through 109 and incorporate those allegations into this count.

178.    At all times material hereto, Defendant CITY and FLOURNOY were charged with the responsibility of adopting and implementing rules, policies, practices, customs, and procedures for the proper and efficient training, supervision, maintenance, and control of HBPD officers and the HBPD SWAT team. These duties included, but are not limited to:

(a) Creation, adoption, and implementation of rules and regulations, practices and procedures for the proper threat assessment that HBPD officers must engage in before they are justified in using force and deadly force. The objective facts to be considered by the officer prior to the use of deadly force include: the nature of the offense; the events that preceded the offense and the apparent dangerousness of the suspect's actions. A reasonable threat assessment includes within the totality of the circumstances a close observation of the suspect's hands, since the hands of the suspect are the most likely source of potential danger to the officer;

(b) Creation, adoption, and implementation of rules, regulations, practices, customs and procedures, toward supervising, and retaining law enforcement officers who do not have a propensity towards violence and the excessive use of force and are properly trained in conducting a proper threat assessment before they use force;

(c) Creation, adoption, and implementation of rules and regulations, practices,

custom and procedures, for proper and efficient training of law enforcement officers in a way and to an extent necessary to ensure the utilization of a force continuum which prevents any propensity towards violence and excessive force, and which ensures that the least amount of force would be utilized to maintain order and control;

(d) Creation, adoption, and implementation of rules and regulations, practices, customs and procedures for the proper and efficient supervision, control, discipline, and assignment of law enforcement officers in a way and to an extent necessary to ensure that citizens will not be subjected to excessive force or unnecessary force by the agents and employees of the HBPD; and

(e) Implementation of rules, regulations, policies, practices, custom and procedures for the proper and efficient supervision, discipline, control, and investigation of law enforcement officers to reduce or eliminate instances of untruthfulness, including excessive force and instances of corroboration or ratification of untruthful accounts of excessive force events committed by fellow law enforcement officers.

(f) Implementation of rules, regulations, policies, practices, custom and procedures to provide for the equal enforcement and protection of law to avoid discrimination against persons of a particular race.

179.    Defendant CITY and FLOURNOY remained deliberately indifferent to these responsibilities failing to adequately train or otherwise supervise and direct HBPD and its officers concerning the rights of the citizens they encounter in their duties, such that it was a well-settled policy, practice, and custom for HBPD Officers, including Defendants MCKENZIE, ALLEN and HEISER to take extreme and reckless actions against people they encounter, including HOWARD Jr., and other persons of color, all in the name of self- defense, resulting in "trigger happy" HBPD Officers killing and/or seriously injuring people.

180.    Defendant CITY and FLOURNOY were on notice as a result the lengthy history of unlawful militarized SWAT raids targeting black neighborhoods and numerous instances of known, reported, and in many instances litigated, officer involved shootings, uses of excessive force, and unlawful arrests. Specifically, the CITY was on notice of lengthy history of unlawful SWAT raids resulting in warrantless entries and violations of the constitutional rights of the

persons of Hallandale Beach, including but not limited to Catherine and Edwin Bernhardt, Tracey

Bell and her family, and the targets of the 38 known SWAT Raids which occurred within the same

quarter mile area where decedent HOWARD Jr. lived. Further, the CITY was further aware that

in the shootings of Kareem McDonald, Gregory Ehlers, Eduardo Prieto, Julian Carson, Rashad

Edwards, and Travis Dixon, its officers were shooting unarmed men without legal justification.

The shooting of these six men, all of whom are persons of color, along with other instances where

HBPD officers employed excessive force or made unlawful arrests against individuals like Leroy

Taylor, Ladson Marvin Preston, Dwayne Shepard, Michael Brack, Hughyland Gregory Napier,

Shaun Hope, Kenneth Salazar, Commissioner Anthony Sanders, and others, evidenced a history

of widespread abuse, and put Defendant CITY and FLOURNOY on notice of the need to correct

its deficient policies concerning de-escalation and avoidance of the use of force.

181.    Additionally, Defendant CITY and FLOURNOY knew or should have known that

their policies established to provide the necessary specialized training and supervision of the

SWAT team and its members during the execution of a search warrant and the use of force were

deficient. These deficiencies included, but were not limited to:

(a) the gathering of information prior to the execution of warrants to eliminate unnecessary risk to the safety of the team members as well as other individuals who might be affected, and/or

(b) properly assess the "threat matrix" of any individual SWAT operation to limit the use of force, and limit the danger of harm to the team members as well as other individuals who might be affected, and/or

(c) properly prepare for unexpected circumstances during the operation to react in a manner that did not create unnecessary risk to the safety of the team members as well as other individuals who might be affected, and/or

(d) proper guidelines intended to indicate when an operation should be abandoned rather than to create unnecessary risk to the safety of the team members as well as other individuals who might be affected, and/or

(e) training and supervision to ensure the proper reporting of the circumstances of any individual operation to guarantee the protection of citizens' rights who suffered injury as a result of the operation.

182.    The statements of FLOURNOY following the shooting and the findings the independent reports firmly establish that the customs, practices, policies, and procedures of HBPD were the moving forces behind HOWARD Jr.'s death and the excessive force used against HOWARD III. As FLOURNOY openly stated the killing of HOWARD Jr. was the result of established HDPB policies that were "not sufficient" to prevent the incident and "needed to be changed."

183.    At all times material hereto, Defendant CITY and FLOURNOY remained deliberately indifferent to the likely violations of rights that were inevitable as a result of the aforementioned inadequate policies.

184.    The deficiencies in training and supervision as alleged herein were so closely related to the constitutional violations which occurred on May 8, 2014 resulting in the death of HOWARD Jr. and use of excessive force against HOWARD III, as set forth in detail above, as to be the moving force and cause thereof.

185.    Plaintiffs, HOWARD BOWE Sr. and BELINDA RAMOS, as the co-personal representative of the estate of HOWARD Jr., claim damages for his wrongful death. Said damages include: loss of the prospective net accumulations of an estate, which might reasonably have been expected but for his wrongful death, reduced to present money value as the survivors of the decedents' include lineal descendants, and for funeral and burial expenses under 42 U.S.C. §1983 and the Florida Wrongful Death Statute.

186.    As a direct and proximate result of the deficient policies of Defendant CITY and FLOURNOY, decedent HOWARD Jr.'s survivors, Plaintiff HOWARD III, a surviving son, NB,

a minor surviving son, and HB, a minor surviving daughter, have sustained the following damages:

        a.   They have, in the past and will in the future, suffer great mental pain and suffering.

        b.   They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

        c.   They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

187.    As a direct and proximate result of the deficient policies of Defendant CITY and FLOURNOY, HOWARD III suffered loss of his liberty, humiliation, and mental anguish.

**WHEREFORE**, Plaintiffs demand judgment against Defendant CITY for compensatory damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

### COUNT X
**Official Policies of Inadequate Investigation and Discipline – Fourth Amendment**
**42 U.S.C. § 1983 as to Howard Jr. and Howard III.**
**(Defendant CITY)**

188.    Plaintiffs re-allege paragraphs 1 through 109 and incorporate those allegations into this count.

189.    At all times material hereto, Defendant CITY and FLOURNOY were responsible for HBPD, its agents and employees, including establishing policies and procedures to conform their conduct to the United States Constitution.

190.    Defendant CITY and FLOURNOY adopted and implemented rules, policies, practices, and procedures for investigation and discipline relating to the use of force by HBPD officers, including the improper and excessive use of force. As determined by an independent study in 2015 to examine those HBPD rules, policies, practices, and procedures intended to investigate

and discipline improper and illegal use of force, the CITY and FLOURNOY were remiss in instituting such rules, policies, practices, and procedures necessary to prevent abuses and violations of rights due to use of force. Multiple areas of deficiency were identified, dating back to 2011.

191.   Specifically, the following deficient policies and practices were identified which were in effect at the time of this incident:

a.   Policy and Procedures were "noticeably absent of any discussion about de-escalation tactics and/or other methods which could be useful in avoiding the necessity to use force;

b.   HBPD did not provide training to its members regarding de-escalation of force and ways to avoid using force;

c.   HBPD policies and procedures did not mandatorily require use of force incidents to be reported and that a supervisor respond and investigate said use of force;

d.   HBPD policies only required investigation of deadly force when a person is killed or injured, not any time deadly force is utilized by an officer;

e.   HBPD was found to have a deficient amount of annual, in-service training for its officers;

f.   HBPD did not have any crisis intervention training for its officers;

g.   HBPD did not have a crisis intervention team;

h.   It was recommended that HBPD officers implement and mandate that all officers be required to demonstrate proficiency with their firearms twice annually, rather than once annually;

i.   It was determined that there was "room for improvement" in Internal Affairs

functioning;

      j.   The Internal Affairs department was found to be deficiently staffed;

      k.   There were no Standard Operating Procedures (SOPs) for the Internal Affairs department;

      l.   Policies and Procedures of HBPD did not mandate that department personnel accept, record, and properly classify all complaints by members of the public which allege misconduct on the part of HBPD employees; and

      m.  HBPD did not have an early-intervention system to determine if an officer has been involved in repeat use of force incidents.

    192.    FLOURNOY and CITY chose a course of action to designate person(s) to oversee the Internal Affairs Unit who were not sufficiently trained, qualified and/or experienced to conduct adequate investigations, or provide sufficient oversight of investigations.

    193.    Additionally, HBPD has no external oversight or auditing of its IA process.

    194.    A known and obvious consequence of inadequate policies concerning handling of citizen complaints and Internal Affairs investigations is that police officers can act with impunity without fear of discipline, resulting in the violation of the Fourth Amendment right of members of the public, such as Decedent, HOWARD Jr. and HOWARD III, to be free from the use of improper and excessive use of force.

    195.    The statements of FLOURNOY following the shooting and the findings the independent reports firmly establish that the customs, practices, policies, and procedures of HBPD were the moving forces behind HOWARD Jr.'s death and the use of excessive force against HOWARD III. As FLOURNOY openly stated the killing of HOWARD Jr. was the result of established HDPB policies that were "not sufficient" to prevent the incident and "needed to be

changed."

196.    Defendant CITY and FLOURNOY remained deliberately indifferent by failing to correct its deficient policies concerning handling of citizen complaints and Internal Affairs investigations.

197.    The deficient policies relating to handling of citizen complaints and Internal Affairs investigations, and these deficient policies were the moving force behind HOWARD Jr. and HOWARD III having his civil rights violated, as these deficient policies resulted in officers acting with impunity and without fear of accountability.

198.    As a direct and proximate result of Defendant CITY and FLOURNOY'S actions and inactions, under color of state law, and in violation of 42 U.S.C. § 1983, HOWARD Jr. was shot and killed and thus was deprived of his constitutional rights to be secure in his person, free from the use of improper and excessive force.

199.    As a direct and proximate result of Defendant CITY and FLOURNOY'S actions and inactions, under color of state law, and in violation of 42 U.S.C. § 1983, HOWARD III was subjected to excessive force and was unlawfully arrested and thus was deprived of his constitutional rights to be secure in his person, free from the use of improper and excessive force.

200.    Plaintiffs, HOWARD BOWE Sr. and BELINDA RAMOS, as the co-personal representative of the estate of HOWARD Jr., claim damages for the wrongful death of HOWARD Jr. Said damages include: loss of the prospective net accumulations of an estate, which might reasonably have been expected but for his wrongful death, reduced to present money value as the survivors of the decedents' include lineal descendants, and for funeral and burial expenses under 42 U.S.C. §1983 and the Florida Wrongful Death Statute.

201.    As a direct and proximate result of the acts of Defendant CITY and FLOURNOY,

decedent HOWARD Jr.'s survivors, Plaintiff HOWARD III, a surviving son, NB, a minor surviving son, and HB, a minor surviving daughter, have sustained the following damages:

     a.  They have, in the past and will in the future, suffer great mental pain and suffering.

     b.  They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

     c.  They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

202.    As a direct and proximate result of the deficient policies of Defendant CITY and FLOURNOY, HOWARD III suffered loss of his liberty, humiliation, and mental anguish.

    **WHEREFORE**, Plaintiffs demand judgment against Defendant CITY for compensatory damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

### COUNT XI
**Custom or Practice of Inadequate Investigation and Discipline – Fourth Amendment**
**42 U.S.C. § 1983 as to Howard Jr. and Howard III**
**(Defendant CITY)**

203.    Plaintiffs re-allege paragraphs 1 through 109 and incorporate those allegations into this count.

204.    At all times material hereto, the City Commission of the CITY and FLOURNOY were the final policymakers for the drafting, adoption and implementation of ordinances and other policies formally regulating the actions of their employees with members of the general public. Prior to May 2014, there were practices and customs that were so widespread, in terms of duration and frequency, that the knowledge of and acquiescence in these practices is chargeable to Defendant CITY and FLOURNOY. Moreover, the CITY and FLOURNOY were directly placed

on notice by responsible members of the community who stated their complaints in detail and demanded change.

205.    By limiting and/or failing to properly investigate, resulting in findings of no excessive force and the justification for Officers' extreme actions, by encouraging the well-settled policy, practice, and custom of using excessive force FLOURNOY has ratified, condoned, and consented to his officers' unlawful conduct, specifically including the unlawful conduct which occurred on May 8, 2014 resulting in the death of HOWARD Jr. and use of excessive force against HOWARD III. The ratification, condoning of, and consenting to, prior unlawful conduct of other officers and the targeted execution of search warrants by the HBPD SWAT team, served as an inducement to violate HOWARD Jr.'s and HOWARD III's civil rights. Defendant CITY and FLOURNOY were on notice of the history of failing to properly investigate (and thus address and correct) the extreme and wanton acts of their officers, with FLOURNOY having been directly approached by responsible members of the community requesting change, and failed to do so, leading to HOWARD Jr.'s and HOWARD III's deprivation of civil rights.

206.    Defendant CITY and FLOURNOY had a custom or practice of inadequate staffing of the Internal Affairs Department, which had been in place for at least 20 years, such that only three people had worked in the IA Department during that period, and for most of that time, only a single employee was assigned to the IA Department at any given time.

207.    As a result of these staffing limitations, investigations are especially protracted. For instance, HBPD shootings from 2011 and 2012 described herein are still the subject of ongoing IA investigations.

208.    A known and obvious consequence of inadequate customs or practices concerning staffing of the Internal Affairs Department is that police officers can act with impunity without

fear of discipline, resulting in the violation of the Fourth Amendment right of members of the public, such as decedent, HOWARD Jr. and HOWARD III, to be free from the use of improper and excessive use of force.

209.    The statements of FLOURNOY following the shooting and the findings the independent reports firmly establish that the customs, practices, policies, and procedures of HBPD were the moving forces behind HOWARD Jr.'s death and the use of excessive force against HOWARD III. As FLOURNOY openly stated the killing of HOWARD Jr. was the result of established HDPB policies that were "not sufficient" to prevent the incident and "needed to be changed."

210.    Defendant CITY has with deliberate indifference failed to correct its inadequate staffing of its Internal Affairs Department.

211.    The deficient policies relating to handling of citizen complaints and Internal Affairs investigations, and these deficient policies were the moving force behind HOWARD Jr. and HOWARD III having their civil rights violated, as these deficient policies resulted in officers acting with impunity and without fear of accountability.

212.    Plaintiffs, HOWARD BOWE Sr. and BELINDA RAMOS, as the co-personal representative of the estate of HOWARD Jr., claim damages for the wrongful death of HOWARD Jr. Said damages include: loss of the prospective net accumulations of an estate, which might reasonably have been expected but for his wrongful death, reduced to present money value as the survivors of the decedents' include lineal descendants, and for funeral and burial expenses under 42 U.S.C. §1983 and the Florida Wrongful Death Statute.

213.    As a direct and proximate result of the acts of Defendant CITY, decedent HOWARD Jr.'s survivors, Plaintiff HOWARD III, a surviving son, NB, a minor surviving son,

and HB, a minor surviving daughter, have sustained the following damages:

      a.  They have, in the past and will in the future, suffer great mental pain and suffering.

      b.  They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

      c.  They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

214.    As a direct and proximate result of the deficient policies of Defendant CITY and FLOURNOY, HOWARD III suffered loss of his liberty, humiliation, and mental anguish.

**WHEREFORE**, Plaintiff demands judgment against Defendant CITY for compensatory damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

## STATE CLAIMS

### COUNT XII
### Wrongful Death of Howard Jr.
### (Defendant MCKENZIE)

215.    Plaintiffs re-allege paragraphs 1 through 8, 13, 21-23, 38, 56-60, 63-65, 72-96, and 104-109 and incorporate those allegations into this count.

216.    Plaintiff files this cause of action pursuant to the Florida Wrongful Death Act.

217.    On May 8, 2014 Defendant MCKENZIE shot HOWARD Jr., intentionally and against the will of HOWARD Jr.

218.    HOWARD Jr. suffered a harmful and offensive contact when he was shot by Defendant MCKENZIE, and died as a result.

219.    Defendant MCKENZIE utilized deadly force upon HOWARD Jr. when non-deadly

force was reasonable and appropriate under the circumstances.

220.    Plaintiffs, HOWARD BOWE Sr. and BELINDA RAMOS, as the co-personal representative of the estate of HOWARD Jr., claim damages for the wrongful death of HOWARD Jr. Said damages include: loss of the prospective net accumulations of an estate, which might reasonably have been expected but for his wrongful death, reduced to present money value as the survivors of the decedents' include lineal descendants, and for funeral and burial expenses under the Florida Wrongful Death Statute.

221.    As a direct and proximate result of the acts of Defendant MCKENZIE, decedent HOWARD Jr.'s survivors, Plaintiff HOWARD III, a surviving son, NB, a minor surviving son, and HB, a minor surviving daughter, have sustained the following damages:

        a.   They have, in the past and will in the future, suffer great mental pain and suffering.

        b.   They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

        c.   They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

        **WHEREFORE**, Plaintiffs demands judgment against Defendant MCKENZIE for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

**COUNT XIII**
**Wrongful Death of Howard Jr.**
**(Defendant CITY)**

222.    Plaintiffs re-allege paragraphs 1 through 16, 21-23, 38, 56-60, 63-65, 72-96, and 104-109 and incorporate those allegations into this count.

223.    Plaintiff files this cause of action pursuant to the Florida Wrongful Death Act.

224.   On May 8, 2014 Defendant MCKENZIE shot HOWARD Jr., intentionally and against the will of HOWARD Jr.

225.   HOWARD Jr. suffered a harmful and offensive contact when he was shot by Defendant MCKENZIE, and died as a result.

226.   The conduct of Defendant MCKENZIE was committed within the course and scope of his employment with Defendant CITY.

227.   Defendant MCKENZIE utilized deadly force upon HOWARD Jr. when non-deadly force was reasonable and appropriate under the circumstances.

228.   At all material times, Defendant CITY, had a duty to act reasonably to the public, including, but not limited to individuals such as HOWARD Jr.

229.   At all material times, the Defendant CITY, through its employees, agents and/or apparent agents, including but not limited to Defendant MCKENSIE, was below the standard of care, and acted in a negligent manner as follows:

a.   Using deadly force upon HOWARD Jr., when non-deadly force was reasonable and appropriate under the circumstances;

b.   Failure to be trained to use proper police technique during arrests of unarmed and non-threatening individuals;

c.   Failing to utilize non-deadly force in a situation that required such use;

e.   Failing to terminate the SWAT raid after it had been compromised;

f.   Unlawfully entering into HOWARD Jr.'s home without knocking and announcing their presence;

g.   Throwing a stun grenade and discharging shotgun rounds at HOWARD Jr. who was unarmed and not resisting arrest;

f.     Failing to follow policies and procedures regarding use of deadly and non-deadly force;

g.     Under all the circumstances failing to act reasonably, including using deadly force when such force should and could have been avoided if acting as a reasonable and prudent law enforcement officer.

230.   As a direct and proximate result of the above negligence of the Defendant CITY; through its employees, agents and/or apparent agents, including but not limited to Defendant MCKENSIE, HOWARD Jr. was wrongfully killed.

231.   Plaintiffs, HOWARD BOWE Sr. and BELINDA RAMOS, as the co-personal representative of the estate of HOWARD Jr., claim damages for the wrongful death of HOWARD Jr. Said damages include: loss of the prospective net accumulations of an estate, which might reasonably have been expected but for his wrongful death, reduced to present money value as the survivors of the decedents' include lineal descendants, and for funeral and burial expenses under the Florida Wrongful Death Statute.

232.   As a direct and proximate result of the acts of Defendant CITY, decedent HOWARD Jr.'s survivors, Plaintiff HOWARD III, a surviving son, NB, a minor surviving son, and HB, a minor surviving daughter, have sustained the following damages:

a.   They have, in the past and will in the future, suffer great mental pain and suffering.

b.   They have, in the past and will in the future, suffer the loss of parental companionship, instruction, and guidance.

c.   They have, in the past and will in the future, be deprived of the support and services of their father, the decedent.

**WHEREFORE**, Plaintiffs demands judgment against Defendant MCKENZIE for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

## COUNT XIV
### Battery of Howard III
### (Defendants HEISER and ALLEN)

233.     Plaintiffs re-allege paragraphs 1 through 8, 14, 15, 63-65, 72-79, and 97-103 and incorporate those allegations into this count.

234.     On May 8, 2014, Defendants HEISER and ALLEN were working as a police officers for Defendant CITY.

235.     On the above date, Defendants HEISER AND ALLEN, did intentionally touch HOWARD III without his consent in an offensive manner by punching, stomping and pushing him.

236.     As a direct and proximate result of the conduct of Defendants HEISER and ALLEN, HOWARD III suffered loss of his liberty and freedom, bodily injury, against and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical care and treatment. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future.

**WHEREFORE,** Plaintiff HOWARD III, demands compensatory damages against Defendants HEISER AND ALLEN, costs, and such other and further relief as the Court deems appropriate.

## COUNT XV
### Battery of Howard III
### (Defendant CITY)

237.     Plaintiffs re-allege paragraphs 1 through 16, 38, 56-60, 63-65, 72-79, and 97-103 and incorporate those allegations into this count.

238.     This is a cause of action, under the common law of the State of Florida, for battery. Such claims arise from a common nucleus of operative facts with violations of 42 U.S.C. § 1983, as set forth above, however, it is alleged here that these acts were not committed with malice, or in bad faith, or wantonly in disregard for well-being, but due to negligence.

239.     At all times material hereto Defendants HEISER and ALLEN owed a duty to HOWARD III, not to cause them harm by offensive conduct, and/or commit battery on them.

240.     The conduct of Defendants HEISER and ALLEN was committed within the course and scope of their employment with Defendant HBPD.

241.     The conduct of Defendants HEISER and ALLEN constituted harmful and/or offensive contact on the persons of HOWARD III beyond any privilege given to law enforcement officers.

242.     Pursuant to Florida Statute Defendant CITY is responsible for the battery committed by Defendants HEISER and ALLEN upon the person of HOWARD III, in that the civil battery was intentional, but not malicious, and was committed within the course and scope of their employment with Defendant CITY.

243.     As a direct and proximate result of the battery alleged above, HOWARD III suffered loss of his liberty and freedom, bodily injury, against and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical care and treatment. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future.

**WHEREFORE**, Plaintiffs seek judgment against Defendant CITY for compensatory damages, costs, and such other relief that the Court deems just and proper.

## COUNT XVI
### False Arrest/False Imprisonment as to Howard III
### (Defendants HEISER, ALLEN and DUBUISSON)

244.    Plaintiffs re-allege paragraphs 1 through 8, 14-16, 63-65, 72-96, and 97-109, and incorporate those allegations into this count.

245.    Defendants HEISER, ALLEN and DUBUISSON proximately caused Plaintiff's arrest in the absence of probable cause or articulable suspicion that Plaintiff committed any criminal offense.

246.    The conduct of Defendants HEISER, ALLEN and DUBUISSON towards Plaintiff was unreasonable and unwarranted and without legal authority, and constitutes false arrest/false imprisonment of Plaintiff under Florida law.

247.    The false arrest/false imprisonment of Plaintiff by Defendants HEISER, ALLEN and DUBUISSON occurred outside the course and scope of their employment or was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, or in the alternative was committed within the course and scope of their employment with such bad faith, malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

248.    As a direct and proximate result of the conduct of Defendants HEISER, ALLEN and DUBUISSON, HOWARD III suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical care and treatment. The losses are either permanent or continuing and Plaintiff will suffer the losses in the future, in violation of Plaintiff's rights under Florida law.

**WHEREFORE**, Plaintiff HOWARD III, demands compensatory damages against HEISER, ALLEN and DUBUISSON, costs, and such other and further relief as the Court deems

appropriate.

**COUNT XVII**
**False Arrest/False Imprisonment as to Howard III**
**(Defendant CITY)**

249.    Plaintiffs re-allege paragraphs 1 through 16, 38, 56-60, 63-65, 72-79, and 97-109, and incorporate those allegations into this count.

250.    This is a cause of action, under the common law of the State of Florida, for false arrest/false imprisonment. Such claims arise from a common nucleus of operative facts with violations of 42 U.S.C. § 1983, as set forth above, however, it is alleged here that these acts were not committed with malice, or in bad faith, or wantonly in disregard for well-being, but due to negligence.

251.    At all times material hereto Defendants HEISER, ALLEN and/or DUBUISSON owed a duty to HOWARD III to not unlawfully cause him loss of liberty or freedom.

252.    The conduct of Defendants HEISER, ALLEN and/or DUBUISSON was committed within the course and scope of their employment with Defendant HBPD.

253.    The conduct of Defendants HEISER, ALLEN and/or DUBUISSON constituted a unlawful restraint of the of HOWARD III, as the detention was made without probable cause or even arguable probable cause.

254.    Pursuant to Florida Statute Defendant CITY is liable for the false imprisonment of HOWARD III by Defendants DUBUISSON, HEISER and/or ALLEN upon the persons of HOWARD Jr. and/or HOWARD III, in that the civil battery was intentional, but not malicious, and was committed within the course and scope of their employment with Defendant CITY.

255.    As a direct and proximate result of the false arrest alleged above, HOWARD III suffered bodily injury and resulting pain and suffering, mental anguish.

**WHEREFORE**, Plaintiff HOWARD III seeks judgment against Defendant CITY for compensatory damages, costs, and such other relief that the Court deems just and proper.

### COUNT XVIII
### Conversion
### (Defendants MCKENZIE and HEISER)

256.    Plaintiffs re-allege paragraphs 1 through 8, 13, 14, 72-87, and 104-109 and incorporate those allegations into this count.

257.    By shooting and killing Tank, Defendants MCKENZIE and HEISER exercised dominion over Plaintiffs property and interference with Plaintiffs' rights.

258.    Defendants MCKENZIE and HEISER's acts constitute a conversion of Plaintiffs' property for which Plaintiffs are entitled to just compensation.

259.    Defendants MCKENZIE and HEISER permanently deprived Plaintiffs of their property and unlawfully interfered with their benefits they did, and could have gained from their loss of possession and ownership of Tank.

260.    As a direct and proximate result of Defendants MCKENZIE and HEISER's actions, Plaintiffs have in the past suffered, and will continue to suffer damages, including, but not limited to grief, mental anguish, emotional distress, and loss of companionship and protection.

**WHEREFORE**, Plaintiffs demand compensatory against Defendants MCKENZIE and HEISER, costs, and such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all counts and on all issues so triable.


Dated: April 24, 2017


**KAPLAN SCONZO & PARKER, P.A.**
PGA Financial Plaza
3399 PGA Boulevard, Suite 150
Palm Beach Gardens, Florida 33410
Telephone: (561) 296-7900
Facsimile: (561) 296-7919


By: **/s/ Stuart N. Kaplan**
STUART N. KAPLAN, ESQUIRE
Florida Bar No. 0647934
**Email:** skaplan@ksplaw.com
JOSEPH G. SCONZO, ESQUIRE
Florida Bar No. 0508720
GREGORY S. SCONZO, ESQUIRE
Florida Bar No. 0105553
**Email:** gsconzo@ksplaw.com
**Secondary Email:** jwise@ksplaw.com

**Law Offices of David A. Frankel, P.A.**
20 South East 20th Street
Fort Lauderdale, Florida 33315
(954) 683-0300
service@bluelotuslaw.com


**By: /s/ David A. Frankel**
David A. Frankel, Esq.
Florida Bar Number: 741779
david@bluelotuslaw.com

## SERVICE LIST

David Frankel, Esq.
Law Offices of David Frankel, P.A.
20 SE 20th Street
Fort Lauderdale, FL 33316
Telephone: (954) 683-0300
Email: eservice@bluelotuslaw.com
*Attorney for Plaintiffs*


Gregory S. Sconzo, Esq.
KAPLAN SCONZO & PARKER, P.A.
PGA Financial Plaza
3399 PGA Boulevard, Suite 150
Palm Beach Gardens, Florida 33410
Telephone: (561) 296-7900
Email:skaplan@ksplaw.com;
Email: gsconzo@ksplaw.com; jwise@ksplaw.com


Matthew H. Mandel, Esq.
Trevor C. Jones, Esq.
Weiss Serota Helfman Cole & Bierman, P.L.
200 E. Broward Boulevard, Suite 1900
Fort Lauderdale, FL 33301
Telephone: (954) 763-4242
Fax: (954) 764-7770
Email: mmandel@wsh-law.com
Email: tjones@wsh-law.com
*Attorneys for Defendant City of Hallandale Beach*

Lourdes E. Wydler, Esq.
Oscar E. Marrero, Esq.
Alexandra C. Hayes, Esq.
Marrero & Wydler
Douglas Center, PH-4
2600 Douglas Road
Coral Gables, FL 33134
Telephone: (305) 446-5528
Fax: (305) 446-0995
Email: lew@marrerolegal.com
Email: oem@marrerolegal.com
Email: ach@marrerolegal.com
*Attorneys for Defendants McKenzie, Dubuisson, Allen and Heiser*

Justin D. Grosz, Esq.
Morelli Alters LLP
1855 Griffin Road, Suite C-470
Dania Beach, FL 33004
Telephone: (305) 571-8550
Fax: (305) 571-8558
Email: jgrosz@morellialterslaw.com
*Attorney for Defendants McKenzie, Dubuisson, Allen and Heiser*